UNITED STATES of America,
Plaintiff-Appellee,

v.

Harlan WAKSAL, Defendant-Appellant.

No. 82–5531.

United States Court of Appeals,
Eleventh Circuit.

July 11, 1983.

Donald L. Ferguson, Miami, Fla., Morris M. Goldings, Boston, Mass., for defendant-appellant.

Stanley Marcus, U.S. Atty., Bruce A. Zimet, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before VANCE and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This case involves another permutation of the extensively litigated question of the propriety of airport stops and searches flowing from the "drug courier profile." Appellant Harlan Waksal appeals his conviction for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Appellant challenges the district court's denial of his motion to suppress cocaine discovered during an airport search allegedly conducted in violation of the Fourth Amendment, 539 F.Supp. 834. We agree that the nature of appellant's contact with the police should have invoked the protections of the Fourth Amendment and that, because the search resulted from an illegal seizure without a valid consent, the suppression motion therefore should have been granted.

1. BACKGROUND

At approximately 9:00 p.m. on February 14, 1981, Broward County, Florida, Deputy Sheriffs Ralph Capone and James Carl observed appellant Harlan Waksal enter the Delta Airlines ticket area of the Ft. Lauderdale International Airport.[1] Appellant, with a companion, approached the ticket lines. The sheriffs' attention apparently was directed toward appellant because he appeared nervous, he was carrying only a shoulder bag and an attache case, and he looked around the terminal area, making eye contact several times with Capone. The officers' suspicions were heightened when appellant did not check any baggage and paid for his ticket in cash, both profile characteristics of the "drug courier."[2]

1. The Ft. Lauderdale-Miami area is known among drug enforcement authorities as the premier situs for the distribution of cocaine to the rest of the United States.

2. The "drug courier profile" was developed by the Drug Enforcement Agency to aid agents in spotting those carrying illegal drugs at airports. While the specific characteristics for which an agent is on the lookout vary from airport to airport, the basic concept underlying all profiles is the same. Drug couriers more often than not can be expected to display several of the following "primary" characteristics:

(1) arrival from or departure to an identified source city;

(2) carrying little or no luggage or large quantities of empty suitcases;
(3) unusual itinerary, such as rapid turn-around time for a very lengthy airplane trip;
(4) use of an alias;
(5) carrying unusually large amounts of currency in the many thousands of dollars usually on their person, in briefcases or bags;
(6) purchasing airline tickets with a large amount of small denomination currency; and
(7) unusual nervousness beyond that ordinarily exhibited by passengers.

*Elmore v. United States,* 595 F.2d 1036, 1039 n. 3 (5th Cir.1979), *cert. denied,* 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980). *See also*

The sheriffs stopped appellant and his companion as they exited the ticket area. The agents, who were non-uniformed, identified themselves by voice and by showing their badges and identification cards. It is undisputed that the agents did not touch appellant, nor did they display firearms. The sheriffs asked appellant for identification and his ticket, whereupon appellant produced an Ohio driver's license and a one-way ticket to Boston; upon request for clarification, appellant explained he was a doctor traveling back to where he practiced in Boston.

Officer Capone then explained that he and Officer Carl were narcotics agents seeking public cooperation in combatting the drug problem in South Florida and requested to inspect appellant's luggage. Appellant repeated that he was a doctor traveling to Boston and that he did not understand the problem, Capone replied that there was no problem, but that he still desired to examine Waksal's carry-on baggage. Waksal then said something akin to, "Go ahead and look," whereupon the officers asked if appellant would accompany them to a small room near the baggage area. Appellant said, "Okay."

At this point, Capone returned the airline ticket to appellant.[3] Appellant's companion, who was not involved in the drug scheme and apparently was unaware of it, left the airport. Appellant and the two officers went to a nearby room used by the airline to store "sky kennels." The officers searched appellant's baggage and found three bags of a white powdery substance. The appellant was arrested and searched, whereupon the officers discovered two additional bags of the substance stashed in his underwear and a small amount in the pocket of his sport coat. The officers found a total of approximately 1 kilogram of cocaine.

■■■ Officer Capone then left to arrange transportation for appellant to the police station, at which point appellant engaged Officer Carl in conversation. Apparently appellant asked what would have been done had he not consented to the search or had he refused to stop and speak with the officers. Officer Carl claims not to have responded to this question until appellant repeated it in the police station. Officer Carl then answered that the sheriffs could have called ahead to the Drug Enforcement Administration ("DEA") in Boston, or could have used a narcotics-detecting dog to sniff the bags in order to establish probable cause to obtain a search warrant.[4]

---

*United States v. Berry,* 670 F.2d 583, 598–99 and n. 17 (5th Cir.1982) (Unit B en banc). In addition, drug runners often will display several of the following "secondary" characteristics:
   (1) The almost exclusive use of public transportation, particularly taxicabs, in departing from the aiport;
   (2) Immediately making a telephone call after deplaning;
   (3) Leaving a *fictitious telephone number* with the airline; and
   (4) Excessive travel to source or distribution cities.
*See Elmore,* 595 F.2d at 1029 n. 3. The profile has proven to be a highly successful investigatory tool for police, as evidenced by the extraordinarily large number of cases challenging convictions resulting from its use.

**3.** The record fails to indicate whether Capone also returned appellant's personal identification at this point. If Capone indeed failed to return the identification until even later, appellant's argument is strengthened. Appellant, however, fails to assert this point and we do not find it critical one way or the other. The threshold point upon which we focus is the *request* that appellant consent to a search while the sheriffs retained his ticket and identification.

**4.** Appellant forwards a version of the facts in which he claims to have asked this question of his alternatives *before* consenting to the search, while still in the airport ticket area. He claims he stated that the officers' response left him with little choice but to consent. He alleges the officers agreed he had no choice but to consent. Appellant's version of the events, and the fact that an assistant state attorney refused to prosecute the case because he was persuaded by this account, is immaterial to this panel on review, because the facts must be construed in the light most favorable to the government, *United States v. Glasser,* 315 U.S. 60, 80, 62 S.Ct. 457, 459, 86 L.Ed. 860 (1942); *United States v. Troutman,* 590 F.2d 604, 606 (5th Cir.1979), and because the district court's credibility choices are binding upon this Court absent clear error. *See United States v. Bowles,* 625 F.2d 526, 536–37 (5th Cir.1980).

Appellant was charged with the violation of 21 U.S.C. § 841(a)(1). On November 13, 1981, the district court denied appellant's motion to suppress the cocaine seized during the airport search, but granted his suppression motion as to any statements made after his arrest but before appellant received *Miranda* warnings. Appellant consented to a non-jury trial on stipulated facts. On April 27, 1982, Waksal was found guilty and sentenced to nine years incarceration to be followed by a five year special parole term.

The district court found that Waksal was not "seized," within the meaning of the Fourth Amendment, during his encounter with the police in the airport ticket area. The court further found that appellant voluntarily accompanied the sheriffs to the back room and consented to the search of his baggage; therefore, the court found traditional Fourth Amendment concerns posed by a warrantless search and seizure were never invoked. The United States urges on appeal that appellant's contact with the officers, due to its voluntary nature, falls wholly without the concerns of the Fourth Amendment. Appellant, on the contrary, claims that the encounter at the airport resulted in an illegal detention under the Fourth Amendment and an impermissible search.

The district court reached its conclusions on appellant's suppression motion without the benefit of this Court's en banc opinion in *United States v. Berry,* 670 F.2d 583 (5th Cir.1982) (Unit B, en banc). *Berry* analyzed the propriety of airport stops and searches conducted under authority of the drug courier profile in light of the "fractured" guidance from the Supreme Court on this issue. In setting forth rules for this Circuit, *Berry* harmonized the disparate conclusions reached by different panels of this Court. It is well settled that the Fourth Amendment aspects of *Berry* are fully retroactive and thus applicable to the instant action,

which involves a conviction "not final at the time the [*Berry*] decision was rendered." *United States v. Robinson,* 690 F.2d 869, 873 (11th Cir.1982).

We must determine whether appellant's encounter with the police violated the strictures of the Fourth Amendment that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." This task is simplified by the government's concession that Officers Capone and Carl did not possess the requisite "reasonable suspicion" to justify a "seizure" under the Fourth Amendment. We limit our consideration to whether appellant's encounter with the officers constituted a Fourth Amendment "seizure," either in the nature of a stop or an arrest.[5] If we determine that a seizure occurred, we must face the question of whether appellant's consent to the subsequent search vitiated any illegalities stemming from the improper police conduct.

2. *General Fourth Amendment Jurisprudence*

█ Recently, courts have identified three distinct tiers of police-citizen encounters, each triggering a different analysis of the balance which should be struck between the government's need to search and the invasion of privacy interests which such a search entails. *See Camara v. Municipal Court,* 387 U.S. 523, 534–37, 87 S.Ct. 1727, 1733–35, 18 L.Ed.2d 930 (1967). *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). The first tier involves contact devoid of detention and coercion, and thus the protections of the Fourth Amendment are not brought into play. The second level of police-citizen encounters involves brief "stops" which must be supported by reasonable, specific, and articulable suspicion. *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20

Included among those findings reversable only if clearly erroneous is the district court's determination of appellant's voluntary consent to the ensuing search. *Id.*

5. The term "seizure" throughout this opinion is used to mean any police-citizen encounter invoking Fourth Amendment protections, without specifying the level of those protections.

**658**

L.Ed.2d 889 (1968).[6] The Court emphasized that the requirement of some objective justification for an encounter is necessary only when a citizen's liberty has been restrained:

> Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

*Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1878 n. 16.[7]

■ The third type of police-citizen encounter involves a full-scale arrest. The traditional and more familiar detention involved in an arrest must be justified by a finding of probable cause.[8]

These precise categories of Fourth Amendment protections begin to shade into one another, almost imperceptibly, when applied to airport searches in general and the facts of this case in particular. The fundamental test for the analysis of airport stops was forwarded by Justice Stewart in his concurrence in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Justice Stewart suggested that a person is seized only if, in view of all the circumstances, a reasonable person believes that he or she is not free to leave. As long as a person to whom questions are put remains free to disregard the questions and walk away, there is no intrusion upon that person's liberty or privacy as would require some particularized and objective justification. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1877 (Stewart, J, joined by Rehnquist, J). While there is no majority opinion in *Mendenhall*, the test employed by Justice Stewart became binding precedent when this Circuit adopted the test in *Berry*.[9]

■ *Mendenhall*, however, fails to provide guidance on whether an *initial* stop constitutes a seizure.[10] We must, therefore, turn to *Berry* to assist us in our analysis of this issue. In *Berry*, we found that, in light of the substantial governmental interests in terminating drug smuggling, it was possible to postulate a scenario in which police intrusion of an individual's liberty at an airport was so minimal as to not concern the Fourth Amendment. If the police, for example, do not interfere with a traveler's progress, do not summon those indicia of authority tending to cause anxiety among

**6.** *Terry* involved the warrantless stop and frisk of people on the street whom an experienced police officer believed, solely from their suspicious actions, were about to rob a store. The court upheld the procedure, making clear that a requirement of less than probable cause may be acceptable to justify a short detention. However, the court cautioned that, "the scope of [a] search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *Id.*, 392 U.S. at 19, 88 S.Ct. at 1878. Thus, a stop conceivably could extend to confirming or denying an officer's reasonable suspicion by asking a simple question or two and to frisking a suspect for weapons if the policeman reasonably believed his or her life was threatened, or the stop could extend to maintaining the status quo by securing an identification if the subject of an officer's reasonable suspicion was perhaps about to get away.

**7.** *Terry* has been applied as well to stops merely for investigative purposes. *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

**8.** "Probable cause exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient to warrant a man of reasonable caution in the belief that 'an offense has been or is being committed [by the person to be arrested].'" *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949), *quoting Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). *Also see Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

**9.** In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982), this Court adopted as binding precedent all the post-September 30, 1981, decisions of the full bench of the former Fifth Circuit or of Unit B.

**10.** *See Berry*, 670 F.2d at 591–92. *Terry* also failed to reach the issue of whether the initial stop, comprising only questions, before the suspect was spun around and patted down, constituted a Fourth Amendment seizure. The *Terry* Court's failure to address this question may explain in part why *Mendenhall* likewise did not provide a conclusive resolution of this issue.

citizens, and delay a traveler for only a brief time, a stop could be of such limited scope and so non-coercive that it would not invoke the Fourth Amendment. *Berry,* 670 F.2d at 594.

██ On the other hand, several factors may indicate police conduct so coercive that a reasonable person, regardless of the overt indications of his or her will, would not feel free to ignore police questioning and simply walk away.[11] Among the more significant of these factors, according to the *Berry* court, are whether the police: physically block an individual's path; place implicit restraints on a citizen's freedom by retaining his or her ticket for more than a minimal amount of time or by taking the ticket over to an airline ticket counter; intimate that an investigation has focused on an individual; or indicate that a failure to respond to questioning or a request to search suggests guilt. *Berry,* 670 F.2d at 597.

In *Berry,* a DEA agent stopped Berry as he was taking luggage to a taxi on the basis of Berry's nervousness and a recognition of his face. Berry and his companion gave false names to the agent. The DEA agent asked Berry and his companion if they were carrying drugs, to which they said they were not. The agent then secured Berry's consent to accompany him to the DEA office. In the office, the agent informed Berry of his right to decline to consent to a search and invited Berry to contact an attorney. Berry agreed to be searched, and illegal drugs were found. The Court found on the facts that the initial contact was not a search, but that the defendants' "forced walk" with DEA agents to an office off the main airport concourse was "tantamount to an arrest." *Id.* at 602. The Court reasoned that the trip to the office was substantially similar to the situation in *Dunaway,* where the Supreme Court found unconstitutional a

detention not justified by probable cause when a suspect was taken in a police van to a station house and questioned in an interrogation room without being formally arrested. *Id.* at 602.[12] Moreover, the *Berry* Court found that a request by police that a suspect accompany them to a separate office raises the presumption of a seizure: "Only exceptionally clear evidence of consent should overcome a presumption that a person requested to accompany an agent to an office no longer would feel free to leave." *Berry,* 670 F.2d at 598.

To the extent the analysis of airport stops in *Berry* may be classified as *dictum,* the principles espoused have become firmly embedded as precedent by subsequent decisions of this Circuit. *See, e.g., United States v. Elsoffer,* 671 F.2d 1294 (11th Cir. 1982); *United States v. Robinson,* 690 F.2d 869 (11th Cir.1982). In addition, the recent decision of the Supreme Court in *Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), affirms the correctness of the *Berry* Court's analysis. In *Royer,* the defendant met several characteristics of the drug courier profile, including travel from a source to a destination city, use of an assumed name, and the carrying of large quantities of solid luggage. After initial questioning, the defendant was asked to accompany two detectives to a small back room. The detectives retained his driver's license and airline ticket and, without Royer's consent, retrieved his luggage from the airline and brought it to the room. The detectives never indicated that Royer was free to depart. A plurality of the Court held that Royer at first was seized under the Fourth Amendment during questions in the airport concourse, and that later, as a practical matter, Royer became subject to arrest in the back room. Absent probable cause, his consent was tainted by this illegality and thus failed to justify the search.

---

11. The Supreme Court has indicated that a court must go behind a reported verbal consent to determine if consent was truly voluntary under all the circumstances, for acquiescence may not substitute for free consent. *See, e.g., Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968).

12. The Supreme Court found that the receipt of *Miranda* warnings by Dunaway did not cure the unconstitutionality of his detention. *Dunaway,* 442 U.S. at 217, 99 S.Ct. at 2259.

*Id.,* —— U.S., at —— – ——, 103 S.Ct., at 1326–29, 75 L.Ed.2d at 239–43. (White, J., joined by Marshall, Powell, and Stevens, JJ.). The plurality in *Royer* also made clear that the state has the burden of proving that a suspect's consent was freely and voluntarily given. *Id.* —— U.S. at ——, 103 S.Ct. at 1322, 75 L.Ed.2d at 234.[13]

### 3. *Analysis*

#### a. *Seizure*

■ Applying these principles to the circumstances of this case, we conclude that Waksal was not seized when first approached by Sheriffs Capone and Carl. We determine, however, that appellant's Fourth Amendment rights were invoked when he was asked to accompany the officers to a nearby office, while the officers continued to retain his ticket and driver's license, absent any indication by the officers that appellant was free to leave, refuse to consent to a search, or contact an attorney. Waksal's Fourth Amendment rights were violated because the officers failed to possess an objective and justifiable rationale for appellant's detention.

Appellant contends that three aspects of the police conduct particularly indicate the unduly coercive nature of the initial stop. First, he claims that his exit from the airline ticket area was physically blocked by the officers. Second, he alleges that the police intimated that an investigation had focused exclusively on him; Waksal notes especially the use of a harsh tone of voice and also claims that the officers stated they were "conducting an investigation." Third, appellant argues that the retention by the police of his ticket and license during the interrogation did not lead him to believe he was free to leave.

The first two of appellant's contentions are without merit. There is no credible evidence that the officers blocked appellant's way. They did not touch appellant, nor did they display firearms. They merely identified themselves as police authorities by displaying their badges and did nothing unusual or objectionable to gain appellant's attention. Nor did the sheriffs suggest that an investigation had focused exclusively on the appellant. Nothing supports the claim that the agents used a harsh tone of voice. The officers carefully chose non-coercive language in asking for appellant's help in combatting the drug smuggling problem in the region. They did not even ask appellant if he was hiding drugs in his bags or on his person.

■ However, appellant's third contention, that the officers failed to return his ticket and license until after Waksal had already consented to accompany them to the nearby office, persuasively indicates an encounter that had progressed beyond truly voluntary police-citizen contact. While obviously not decisive under a totality of the circumstances test, this factor is nevertheless highly material in analyzing the coerciveness of the police conduct. We fail to see how appellant could have felt free to walk away from police officers when they still possessed the documents necessary for him to continue his journey. The police action necessarily leads us to question the voluntariness of Waksal's consent to accompany the agents to the office and the resulting search.

In *United States v. Elsoffer,* 671 F.2d 1294 (11th Cir.1982), this Court found that the retention of a suspect's ticket and license strongly suggested that Elsoffer was not free to walk away from the police. The Court stated:

> In particular, the [*Berry*] court noted that retaining an individual's ticket for more than a minimal amount of time might well tip the balance in favor of holding that, in light of the circumstances supporting an airport stop, a seizure has occurred. At 597. We believe that that last consideration is applicable in this case. Agent Mathewson retained Elsoffer's ticket while asking for his driver's

---

**13.** Justice Brennan, in a separate concurrence, focused on the police request for the airplane ticket and identification as the point at which Royer became impermissibly seized. —— U.S. at ——, 103 S.Ct. at 1330, 75 L.Ed.2d at 243.

license, then retained both documents while interrogating him. Given the circumstances surrounding an airport stop, Elsoffer hardly could have felt free to leave while Mathewson retained the ticket—especially since Elsoffer needed the ticket in order to continue his flight to New York. We hold that a seizure occurred when Agent Mathewson retained the ticket while asking for further identification.

*Elsoffer,* 671 F.2d at 1297. This reasoning is persuasive in the instant action.

The depth of the *Elsoffer* Court's concern over this factor showing coerciveness is demonstrated by the *dictum* offered in the following footnote:

> We note that our holding [of a seizure prior to the request to go to the lounge] would not differ even if the record was clear in showing that the agents had returned Elsoffer's documents before asking him whether he would consent to a search or go to a lounge. We do not believe that after a return of the documents retained during interrogation, followed by requests to consent to a search and go to an office, an individual would feel that his detention had ended.

*Elsoffer,* 671 F.2d at 1298, n. 7. We do not go so far as to adopt this *dictum* because it is unnecessary for us to reach this specific issue. Nevertheless, in light of this Court's concern for the implicit coerciveness of seemingly neutral police-citizen encounters, *Elsoffer's* resolution of the *Mendenhall* test creates a nearly impossible burden for the appellee to overcome on the facts here.

This factor was also cited as significant in *United States v. Robinson,* 690 F.2d 869

(11th Cir.1982). In that case, police officers had stopped a citizen and retained his ticket and driver's license while securing consent to go to another room to conduct a search. Just as in the instant case, the police officer returned the ticket before the actual trip to the back room. The Court noted that these particular facts played an important part in its finding of a seizure. *Id.* at 875. The Court stated that the agent's "holding [Robinson's] license and ticket he needed for his flight to Birmingham would 'strongly indicate that a reasonable person would believe his freedom restrained.' " *Id.* at 877, *quoting Berry,* 670 F.2d at 603, n. 26 (footnote omitted). The *Berry* court also recognized the importance of this factor in an analysis of the *Mendenhall* test. *See Berry,* 670 F.2d at 597.[14]

Another factor which we believe weighs heavily in favor of finding a seizure invoking appellant's Fourth Amendment rights is the failure of the police to notify appellant of his freedom to leave and not consent to the search, or of his right to consult with an attorney before reaching a decision. While there is no requirement that the state prove Waksal knew he had a right to withhold his consent, such knowledge is a factor to be taken into account in determining the voluntariness of his consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Indeed, in *Mendenhall* the plurality deemed such knowledge highly relevant to determining actual consent. Evidence of knowledge of the ability to withhold consent substantially lessens the probability that the police conduct reasonably appeared coercive. *Mendenhall,* 446 U.S. at 558–59, 100 S.Ct. at 1879.[15]

**14.** *Mendenhall,* in which the Supreme Court found there was no seizure on the facts, 446 U.S. at 555, 100 S.Ct. at 1877–78 presented a less compelling case for elevating the importance of this factor than does the instant action. In *Mendenhall,* the DEA agents returned the petitioner's ticket before she was asked to go to the DEA office. In addition, Mendenhall was told explicitly that she had the right to decline the search.

Other circuits have also identified the retention of documents beyond the interval required for an appropriate brief scrutiny as a "water-

shed point" in the seizure question. *See United States v. Viegas,* 639 F.2d 42, 44 n. 3 (1st Cir.), *reh. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981); *United States v. Black,* 675 F.2d 129, 140 (7th Cir.1982). *Also see Mendenhall,* 446 U.S. at 570 n. 3, 100 S.Ct. at 1885 n. 3 (White, J., dissenting) ("It is doubtful that any reasonable person about to board a plane would feel free to leave when law enforcement officers have her plane ticket.").

**15.** *See also United States v. Phillips,* 664 F.2d 971, 1023–24 (5th Cir.1981), *cert. denied,* 457

We therefore conclude, on the totality of the circumstances, that the district court clearly erred in finding that appellant was not seized within the meaning of the Fourth Amendment. From the point at which the police secured appellant's ticket without informing him of his right to decline the search, appellant could not reasonably have felt free to leave.[16] We refrain from determining, however, whether the subsequent trip to the back room was tantamount to an arrest since such a finding would add nothing to our analysis. The United States has already conceded that Officers Carl and Capone lacked reasonable suspicion for the stop. Given this concession, it is obvious that probable cause, the necessary prerequisite for an arrest, did not exist to believe a crime was being committed. Because appellant's Fourth Amendment rights were called into play by the restraint of his liberty at the airport, it is unnecessary to determine whether appellant was subject to a more significant violation than a "stop" where the absence of any valid justification is willingly conceded.

### b. Suppression of the evidence

█ The only issue remaining for our determination is whether the cocaine obtained during the offending seizure should have been suppressed at trial. Ordinarily, evidence secured by the exploitation of the illegality of a search or seizure is "the tainted fruit of a poisonous tree" and is not admissible at trial. *See generally, Wong Sun v. United States,* 371 U.S. 471, 83

U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).

**16.** The government argues that Waksal was trying to bluff his way through a difficult situation by asserting that he was a doctor, under the belief that one of such status would be beyond suspicion. The government suggests that appellant, by complying with the officer's request, was only trying to play along and avoid the necessity of a search. The district court, while not going so far as to adopt this theory as a factual finding, termed it "credible." Since the district court refrained from making an explicit factual finding on this theory, we do not need to explicitly overrule it. This suggested theory, however, is not particularly relevant to assessing an individual's per-

S.Ct. 407, 9 L.Ed.2d 441 (1963); *Dunaway,* 442 U.S. at 218–19, 99 S.Ct. at 2259–60 (statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the products of the illegal detention and not the result of an independent act of free will). However, evidence seized through the exploitation of an illegality becomes admissible upon "proof both that the consent was voluntary and that it was not the product of the illegal detention." *Berry,* 670 F.2d at 604. *See also Brown v. Illinois,* 422 U.S. 590, 601–602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975) (*Wong Sun* requires not merely that a statement meets the Fifth Amendment voluntariness standard but that it be "sufficiently an act of free will to purge the primary taint" in light of the distinct policies and interests of the Fourth Amendment). The second prong of the required proof concerns the attenuation of the illegality. Factors to be considered in this inquiry are: "(a) the temporal proximity of the arrest and the consent to the search, (b) intervening circumstances, and (c) the purpose and flagrancy of the official misconduct. *Taylor v. Alabama,* —— U.S. ——, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York,* 442 U.S. 200, 218, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979); *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975); *Berry,* 670 F.2d at 604–05; *U.S. v. Robinson,* 625 F.2d at 1219–20." *United States v. Robinson,* 690 F.2d 869, 877 (11th Cir. 1982).[17]

ception of his or her liberty under the *objective* "reasonable person" standard.

**17.** We note that the factors relevant to the consent inquiry are quite similar to those relevant to the seizure inquiry discussed above. *See Robinson,* 690 F.2d at 876, n. 5. *Also see Royer,* —— U.S. at ——, 103 S.Ct. at 1326, 75 L.Ed.2d at 239 (upon going to the back room, the *consent* given by Royer evaporated, leaving him as a practical matter under arrest). We also note that an appellate court may consider suppression based upon the taint of an illegality where there is no district court finding but where there is a sufficiently developed factual record, as in this case. *See Brown v. Illinois,* 422 U.S. at 604, 95 S.Ct. at 2262.

■ As the discussion of seizure above indicates, appellant's statements were not actually voluntary under the circumstances of the seizure. The United States has failed to meet its burden of proving that the consent was freely and voluntarily given. *Royer,* —— U.S. at ——, 103 S.Ct. at 1322, 75 L.Ed.2d at 234. Moreover, we are unable to conclude that appellant's statements were not the product of the illegal seizure. No significant intervening event purged the taint of the illegal restraint on appellant's liberty. *Robinson,* 690 F.2d at 877–78. Thus, we are persuaded that the district court erred in admitting the cocaine into evidence, as it was tainted by the illegal seizure.[18] Although this result may be unsettling because of our society's strong interest in stemming the flow of illegal drugs, we must recognize that the constitutional protections of the Fourth Amendment are to shield the innocent, even though the one who claims and benefits by them in this particular case indisputably sought to violate the law.

REVERSED.

---

**18.** This finding obviates the need to reach appellant's contentions on the inadmissibility of testimony by witnesses hypnotized sometime before the trial.