# STATE OF FLORIDA v. D'APICE
## Case No. 82-13741 CF 10
Seventeenth Judicial Circuit, Broward County
July 11, 1984

## APPEARANCES OF COUNSEL

Office of the State Attorney for plaintiff.

**Richard Rendina** for defendant.

## OPINION OF THE COURT

J. LEONARD FLEET, Circuit Judge.

"Those who cannot remember the past are doomed to repeat it." (George Santanya, The Life of Reason).

The words quoted above are an appropriate introduction to the recurring necessity of our courts to resolve the same question over and over, viz.

"Did the defendant, charged with trafficking in a controlled substance, validly consent to the search that occurred at an airport after the defendant was stopped by a plainclothes officer working there in

an effort to interdict the flow of controlled substances aboard commercial aircraft operating within this country?"

If the Court's answer to the question posed above is in the affirmative, the accused is confronted with a narrow range of choices, any one of which will have a profound effect upon the life of the defendant and upon the lives of those to whom the defendant is important. If the Court's answer to the question posed is in the negative, it is necessary that the legal analyses leading to such conclusion be set forth in such a manner as to be of benefit to those who serve upon the front lines of the war against the transportation of substances that are inherently destructive to those who use them. The legal exposition is the only assistance that the Courts can give to those in the field so that they may avoid repeating the mistake that causes a seemingly sound case to disappear into thin air.

In this case, as in almost all cases of a like nature, the Court must reconcile sharply conflicting testimony given by those that were either witness to, or actors in, the same event. In many instances, the ultimate ruling produces a result that is as distasteful to the judge who makes the decision as it is to the losing party. To paraphrase Justice Marshall's statement in *McCullock v. Maryland*, 4 Wheaton 316, 407 (1819), we must never forget that it is a constitution about which we are expounding!

### SUMMARY OF TESTIMONY OF DEPUTY SHERIFF DeCOURSEY

On December 30, 1983, while on covert surveillance at the Ft. Lauderdale/Hollywood International Airport, at about 9:05 P.M., Broward County Deputy Daniel DeCoursey observed the defendant, Michael Francis D'Apice, enter the terminal area of Delta Airlines accompanied by another person (later identified as Robert Charles Karpe). In the opinion of Mr. DeCoursey, Mr. D'Apice scanned the area in a manner not usually associated with those who are traveling upon the airplanes. The defendant was noted to purchase, for cash, a round trip ticket from Ft. Lauderdale to Hartford, Connecticut, via Atlanta, Georgia; the airplane selected was scheduled to depart at 9:15 P.M. Throughout the time that the defendant was waiting his turn to make his ticket purchase, he was observed to shift his weight from one foot to the other and back again, all the while looking all around the area with such vigor as to maintain the attention of Mr. DeCoursey.

Upon securing his ticket from the Delta Agent, Defendant proceeded to walk toward his assigned departure gate, now accompanied by his companion who had stood apart from Defendant while the latter was

**55**

purchasing his ticket. Before Mr. D'Apice and Mr. Karpe reached the departure gate, and while in the proximity of the room where the search now under review occurred, Mr. DeCoursey and his associate, Agent R. Vincent, approached the gentlemen, identified themselves and requested the would-be passengers if they would mind speaking with the officers. Mr. D'Apice and Mr. Karpe both stopped walking, agreed to speak with the law enforcement officers and, when requested to do so, handed over their airline tickets for examination. Mr. Karpe also gave Mr. DeCoursey other identification but Mr. D'Apice asserted that he had no such other documentation. The airline tickets were promptly returned to their respective owners after a cursory examination by Mr. DeCoursey.

Mr. DeCoursey next explained to Mr. D'Apice and Mr. Karpe that he and his companion were law enforcement officers charged with the responsibility of stopping the transportation of drugs by those utilizing the airlines for travel and their efforts necessitated that a "hand search" of luggage be conducted. The travellers were further advised that they could decline permission for such a search. Mr. D'Apice and Mr. Karpe waived their right to refuse permission to search and agreed to have their luggage examined. Mr. DeCoursey directed the gentlemen to accompany him and his partner to a storage room approximately thirty feet away so that the search could be conducted in private, thereby sparing the defendant and his companion any unnecessary embarrassment and, in addition, to avoid losing the confidential nature of the officers so that their continued efforts would not be hampered.

Once inside the storage room, a search of the small travel bag which was in the possession of Mr. D'Apice (and which was the only luggage he was carrying) yielded nothing of a criminal nature. Mr. DeCoursey then requested permission from Mr. D'Apice to conduct a "pat down" search of his person, to which request Mr. D'Apice gave his consent without hesitation. During the course of the body search, Mr. DeCoursey determined that there was a bulge located on the lower portion of Mr. D'Apice's right leg. When the bulge was removed from within Mr. D'Apice's sock it was determined to be a brown paper bag containing the cocaine which is now sought to be suppressed from evidence.

## SUMMARY OF TESTIMONY OF ROBERT CHARLES KARPE

Mr. Karpe, a friend of Mr. D'Apice for about two years, having previously worked with him in the State of Connecticut, came to Florida to vacation about four or five days prior to the date upon which the instant events occurred. He had travelled to Florida by airline, having purchased a round trip ticket in Connecticut. When he

arrived at the airport in Florida on the day of Mr. D'Apice's arrest, his plan was to travel back to Connecticut in the same airplane as Defendant.

According to Mr. Karpe, he and Mr. D'Apice arrived at the Ft. Lauderdale/Hollywood Airport at approximately 9:00 P.M. via taxi. Upon being discharged from the taxicab at the Delta Airlines Terminal, Defendant entered the ticket line to purchase his passage while Mr. Karpe stood to the side of the line. Mr. Karpe, as previously noted, was already in possession of his ticket. While waiting for Mr. D'Apice, Mr. Karpe noticed two men (later identified as Mr. DeCoursey and Mr. Vincent) observing himself and Defendant. As Mr. Karpe and Mr. D'Apice were walking towards the departure gate, they were confronted by the law enforcement officers.

When contact was made with them by Mr. DeCoursey and Mr. Vincent, the travellers were informed of the purpose of the contact and were asked if they would speak with the officers. Upon consenting to talk, Mr. D'Apice and Mr. Karpe presented their tickets to the officers upon request; Mr. Karpe also presented separate identification but Mr. D'Apice denied having any such separate documentation. The tickets were retained by the officers who then asked for permission to conduct a search of the luggage of Mr. Karpe and Mr. D'Apice, to which request only Mr. Karpe agreed, Mr. D'Apice remaining silent. Mr. Karpe and Mr. D'Apice were then escorted into the storage room for the purpose of the luggage search. Mr. Karpe denied being told that either he or Mr. D'Apice could refuse permission to search their respective pieces of luggage.

Once inside the storage room, entry to which was delayed by the necessity of the officers having to do something to the door to get it to open, the luggage was promptly searched with no contraband being located. Neither Mr. Karpe nor Mr. D'Apice voiced any objection to the search when inside the storage room. None of their luggage was locked, thereby eliminating the necessity of either of the travellers having to take any affirmative action to enable the search of the luggage to take place.

Mr. Karpe testified that when the search of Mr. D'Apice's luggage was completed, the officer who searched the luggage pushed Mr. D'Apice up against a wall and started patting him down. No request was made by such officer for permission to conduct the body search of Mr. D'Apice nor did Mr. D'Apice verbalize any objection thereto. It was Mr. Karpe's recollection that Mr. D'Apice's face was forced to the side and he was being held by the back of the neck by the searching

**57**

officer. Ultimately, the searching officer pulled up Mr. D'Apice's pants leg and removed from Defendant's boot the bag containing cocaine. The body of Mr. Karpe was then searched but no contraband was found thereon.

Once the search in the storage room was completed, Mr. Karpe and Mr. D'Apice were escorted back to the terminal lobby where Mr. Karpe was given his driver's license but his ticket was given to the airline officials. The officers continued to retain Mr. D'Apice's airplane ticket. Mr. Karpe was not further detained while Mr. D'Apice was taken to the Broward County Sheriff's Office for processing.

## SUMMARY OF TESTIMONY OF MICHAEL FRANCIS D'APICE

Defendant first became aware of Mr. DeCoursey and Mr. Vincent when they stopped him and his companion, Mr. Karpe. Initial contact was made after Mr. D'Apice had purchased, at the Delta Airlines ticket counter at the Ft. Lauderdale/Hollywood International Airport, round trip passage to Connecticut via Atlanta. The officers displayed their badges and advised Defendant that they were officers who were attempting to stop the flow of drugs through the airport. To their request that he talk with them, Mr. D'Apice gave his consent but only after voicing his concern about missing the departure of his airplane and being assured by the officers that they would not cause him to miss his flight. It was at this point that his ticket was taken and kept by one of the officers.

Defendant testified that the officers requested that he and Mr. Karpe accompany them into the storage room, to which request Defendant merely shrugged his shoulders and then followed the officers into the room. To enter the room where the search ultimately occurred, one of the officers manipulated some buttons on a dial on the door after which the door was opened. Once inside the room, the officers commenced the search of the carry-on luggage of Defendant without having first obtained permission to do so. The luggage search producing no contraband, the person of Defendant was then searched, again without prior consent being given. The body search lead to the discovery of the bag of cocaine concealed in Defendant's boot. The body search was conducted without the touching of his head described by Mr. Karpe.

At no time, stated the Defendant, was he advised that he had the right to refuse permission for the search of either his luggage or his person. Further, the Defendant denied being advised, at any time, that he was free to leave the airport or the area where he was in contact with the officers, nor was any explanation given to Mr. D'Apice or Mr.

58

Karpe as to how to open the door, the buttons to which had been manipulated by Mr. DeCoursey in order to enter into the room.

## ANALYSIS OF RELEVANT LAW

Were it the position of the State that the stop of the Defendant was predicated upon Florida's Stop and Frisk Law, as that concept is set forth in F.S. 901.151, the Court would promptly dismiss this search as being inappropriate without further discussion. For a law enforcement officer to be justified in the stop of a citizen pursuant to F.S. 901.151 it is necessary that the officer be capable of articulating facts that would show that the officer was possessed of a founded suspicion that the person stopped is either committing a crime, has committed a crime or is about to commit a crime. "Founded suspicion" is defined as ". . . a suspicion which has some factual foundation in the circumstances observed by the officer when those circumstances are interpreted in the light of the officer's knowledge. 'Mere' or 'bare' suspicion . . . cannot support detention." *State v. Stevens*, 354 So.2d 1244, 1247 (Fla. 4th DCA 1978); *State v. Beja*, 451 So.2d 882 (Fla. 4th DCA 1984); *Terry v. Ohio*, 392 U.S. 1 (1968).

Examination of the testimony of Mr. DeCoursey establishes that the sole reason for the confrontation with Mr. Karpe and Mr. D'Apice was the conclusion of Mr. DeCoursey that the subjects matched, at least in part, the so-called smuggler's profile. Upon the advent of *Florida v. Royer*, 103 S.Ct. 1319 (1983), the smuggler's profile—without more—is no longer a tool that may be utilized to justify a stop of a traveller. In the record now before the Court there is no suggestion that there exists the "something more" called for by *Royer*, supra.

Note must also be taken of the opinion of the United States Supreme Court in *Reid v. Georgia*, 100 S.Ct. 2752 (1980), published at approximately the same time as *U.S. v. Mendenhall*, infra. In *Reid*, the United States Supreme Court clearly states that partial compliance with the smuggler's profile was not acceptable as being a sufficient basis for the stop of a private citizen en route in travel upon one of the common carriers. In fact, in circumstances more suspicious than those now before the Court, the Supreme Court struck down a search and wrote that law enforcement officials, ". . . could not, as a matter of law, have reasonably suspected (Defendant) of criminal activity on the basis of (the) observed circumstances." Id. at page 2754.

This Court is aware that not every encounter between a citizen and a law enforcement officer amounts to a situation wherein the protections of the Fourth Amendment of the United States Constitution come into play. *United States v. Mendenhall*, 100 S.Ct. 1870 (1980). However, to

**59**

avoid just such a situation from arising, it is necessary that the citizen be fully apprised of the right to decline the requested search and to proceed upon a course of conduct that would take the citizen away from the travel terminal. *Mendenhall,* supra; *State v. Grant,* 392 So.2d 1362 (Fla. 4th DCA 1981). Although the initial contact in the instant case between Mr. DeCoursey and the two subjects does not rise to the level of a detention while they remained in the open corridor of the Delta Airlines Terminal, a completely different situation is presented once the parties repair to the room where the actual search occurred. Once Mr. Karpe and Mr. D'Apice observed that it was necessary to operate some type of security device in order to enter the room where the search was conducted, the Court is of the opinion that there had been a show of some degree of force and authority on the part of Mr. DeCoursey and his associate. Such conclusion is reinforced by the failure of the record to reflect that the officers informed the subjects that departure from the search room was obtained by merely turning the door knob without the necessity for the entry of any code into any locking device.

In an opinion announced in 1983, the Court of Appeals for the Eleventh Circuit found that an otherwise innocuous contact between a law enforcement officer and a citizen was converted to a Fourth Amendment protected "seizure" when the citizen was asked to accompany the officer to a nearby room. *United States v. Wacksal,* 709 F.2d 653. The fact that the officers were found, in *Wacksal,* to have retained the Defendant's tickets and other documents (as stated here by Mr. Karpe) is important but not sufficient to remove such case from the consideration of the Court in the instant matter. The important principle to be extrapolated from Wacksal insofar as the instant matter is concerned is the sense of confinement and restraint likely to be engendered within one when entry into a search room is accomplished by the law enforcement officer entering a code into a locking device for the purpose of opening the door thereto. Such sense of confinement is reinforced when the officer fails to advise the person about to be searched of the right to proceed, unmolested and unsearched, about the person's business before the search is conducted.

To this Court, the conclusion that the entry into the locked search room is likely to engender a sense of confinement, seems to be a logical deduction given the natural nervousness that arises when even the most innocent of people is confronted in the manner now before the Court. Since the Courts are mandated, and rightly so, to utilize common sense when reviewing search warrants, *Illinois v. Gates,* 100 S.Ct. 2317 (1983), it seems sound practice to apply the same standard to warrant-

60

less searches that occur in common carrier terminals. The application of common sense to the case at bar causes the Court to find it inconceivable that, at least as to Mr. D'Apice, there was no sense of restraint within him when he entered the search room. Further, having already noted that Mr. D'Apice appeared unusually nervous when he was in the ticket line, the Court finds it inconceivable that such enhanced nervous state was not noticeable to the law enforcement officers about to conduct the search. Being put on guard by the continued deterioration of the defendant's emotional state, the officers were duty bound to be absolutely sure that the accused was fully and properly informed of his right to refuse the search *and* to proceed upon his way without further police involvement.

As to the search of the person of Mr. D'Apice, the Court is even more chagrined by the lapse on the part of the law enforcement officers. Mr. DeCoursey testified that Mr. D'Apice gave his consent to the pat down search of his body without hesitation once the search of the luggage was complete in the search room. Once again the absence of the advice of the right to depart the area without further intrusion of his personal effects is glaring.

Because of the Court's position concerning the need to advise him of his right to go about his way without submitting to the search, and the absence of such advice, the Court places much less importance upon how, if ever, Mr. D'Apice announced his consent to a body search. However, in the interest of conservation of judicial endeavor, the Court finds that the State has failed in carrying its burden of proof on this point. Mr. Karpe said that Mr. D'Apice, when requested to consent to the search of the luggage in the first instance, had remained silent and merely went along to the search room. When the luggage search was completed, according to Mr. Karpe, a body search was promptly performed upon Mr. D'Apice with no request for permission. Mr. D'Apice, to his credit, acknowledged giving consent, however reluctant, to the luggage search; however, when it came to the body search, Mr. D'Apice testified that he merely shrugged his shoulders after which the body search was conducted.

The burden of proof to establish the exception to the requirement that all searches be made pursuant to a warrant is solely upon the State. *Bumper v. North Carolina,* 88 S.Ct. 1799 (1968). Mere submission to apparent police authority is not sufficient to establish the exception of consent. *Rawlings v. Kentucky,* 100 S.Ct. 2556 (1980). To carry its burden of proof, the State must establish free and voluntary consent by clear and convincing evidence. *Bailey v. State,* 319 So.2d 22 (Fla. 1975); *Norman v. State,* 379 So.2d 643 (Fla. 1980). Consent

**61**

cannot be inferred from the passivity of the accused, especially where the law enforcement officer is cloaked with the apparent authority to conduct the search under attack. *Major v. State*, 389 So.2d 1203 (Fla. 3rd DCA 1980). It is incumbent upon the State to establish express consent. Id. In the case at bar, Mr. DeCoursey testified that the defendant verbalized the word "Yes" in response to the request for permission to search his person. Nonetheless, the Court finds that it is possessed of a reasonable doubt on this very material point and such doubt must be resolved in favor of the accused.

## CONCLUSION

The decisions set forth in this opinion that mandate the order here entered are not new law; each and every principle has been long established and the persons who are charged with the responsibility of enforcing the law are to be charged with full knowledge thereof. It is not necessary that line law enforcement officers be lawyers in order to avoid the mistakes that led to the order now entered; rather it is necessary that more than lip service be paid to the term "law enforcement officer". In the absence of a well-informed, courageous and articulate membership within the ranks of those who must meet crime in the streets where it most frequently occurs, the courts and trial attorneys are cast into a posture of being adversaries to the line officer. In fact, all who labor within the criminal justice system are compatriots in a common cause: the common sense, constitutional enforcement of the laws necessary to govern our society.

In the instant case, the Court is satisfied that Mr. DeCoursey and his associate are the type of persons that an honorable, efficient law enforcement agency needs in order to be effective. Unfortunately, in the case at bar, the officers here involved fell prey to the trap that has ruined so many other seemingly certain cases—the failure to take the one final step necessary to secure the hatch upon the accused. It is not within the province of any court to close its judicial eyes to a violation of a constitutional principle however much those eyes must water when an obviously guilty person goes free, as is the case in the matter now before the Court. To repeat that which was said at the outset of this opinion, we must never forget that it is a constitution about which we are expounding.

The Motion to Suppress filed by Defendant Michael D'Apice is hereby GRANTED.