## STATE OF FLORIDA v. LEBLANC

### Case No. 84-5573 CF

Seventeenth Judicial Circuit, Broward County

October 2, 1984

### APPEARANCES OF COUNSEL

State Attorney's Office for plaintiff.

**Richard Ozelie** for defendant.

### OPINION OF THE COURT

J. LEONARD FLEET, Circuit Judge

Defendant, John Joseph LeBlanc, has filed a motion requesting this Court to suppress certain physical evidence obtained from his suitcase, the search of which was predicated upon a "dog alert", which "dog alert" was, primarily, the basis upon which a search warrant was issued allowing the law enforcement officers to examine the contents of Mr. LeBlanc's suitcase.

In resolving the matter now before the Court, the Court has, by agreement of counsel for the State of Florida and counsel for the accused, relied upon the memorandums of law submitted by the parties and the factual recitation admitted by the defendant in his Motion to Suppress. (The State has accepted such statement of facts as being accurate).

### FACTUAL ANALYSIS

Thursday, May 17, 1984, at approximately 9:05 o'clock A.M., Broward Sheriff's Office Agents Richard Green and Carol Knapick approached John LeBlanc while he was sitting on an outside bench at the Amtrak Train Station in Fort Lauderdale. Agent Green stood to Mr. LeBlanc's left, and Agent Knapick to his right. Agent Green informed Mr. LeBlanc that they were officers with the Broward Sheriff's Department and further identified themselves by producing their badges and identification cards. The agents made contact with Mr. LeBlanc as a result of observing his allegedly nervous behavior, to-wit: sitting on an outside bench with his legs protectively straddling his suitcase; then pacing back and forth in front of his suitcase; chain smoking cigarettes; and looking at the agents (who were in plain clothes with a pager attached to their waistbands) a number of times. At this time, Agent Green asked Mr. LeBlanc if he had any luggage to which he stated that the subject suitcase in front of the bench was his. Agent Green then requested, and Mr. LeBlanc produced, his train ticket and his Massachusetts Driver's License. The names on the ticket and driver's license were identical. According to Agent Green, he inspected and then returned the ticket and driver's license to Mr. LeBlanc. Mr. LeBlanc was scheduled to depart on the 9:28 A.M. train to Washington, D.C. with a connection to Boston, Massachusetts.

Agent Green next proceeded to inform Mr. LeBlanc that he and Agent Knapick were narcotics officers and it was their duty to prevent the flow of drugs to and from South Florida. Agent Green then told Mr. LeBlanc that as a part of their efforts to control the drug problem, they would like permission from Mr. LeBlanc to search his suitcase, but that he had the right to refuse the request. Agent Green further states that during this conversation, Mr. LeBlanc allegedly had beads of perspiration all over his face and forehead.

Mr. LeBlanc stated that he did not wish to cooperate with the police and refused to allow the search of his suitcase. In response to his statement, Agent Green informed Mr. LeBlanc that he suspected Mr. LeBlanc of carrying narcotics in his suitcase and that Mr. LeBlanc would be "detained" at the train station so that a drug dog could be

summoned to perform a line-up on the suitcase. Agent Green informed Mr. LeBlanc that the dog would arrive in approximately one-half hour and that he would not be allowed to board the 9:28 A.M. train. Mr. LeBlanc responded by asking Agent Green if there was an afternoon train, to which Agent Green stated there was, and Mr. LeBlanc then allegedly told Agent Green that he was "not in a hurry" and to "go ahead and get the dog". While awaiting the arrival of the dog, Agents Green and Knapick retained possession of the subject suitcase. Mr. LeBlanc requested and received permission from Agent Green to use the telephone in the train station. Prior to the arrival of the drug dog, Mr. LeBlanc's scheduled 9:28 A.M. train arrived and departed on time. The drug dog "Sean" and Detective Joseph Nutt arrived at the train station approximately 9:40 A.M. The dog reacted affirmatively to the subject suitcase, at which time Mr. LeBlanc was transported to the Fort Lauderdale Airport Substation, and a search warrant was obtained prior to opening the suitcase.

## ANALYSIS OF LAW

*United States v. Mendenhall*, 446 U.S. 544 (1980), established the proposition that officers who seek to interdict persons travelling in interstate commerce in order to ascertain whether or not such persons are illegally transporting narcotics, are required to advise the traveller of the traveller's right to refuse the search and, in addition thereto, of the traveller's right to depart the area where the contact with the law enforcement officer has occurred. Such information is necessary, says the United States Supreme Court, in order that a reasonable person would believe that the freedom to leave and go about one's way had not been impaired. The so-called "smuggler's profile" has been condemned by the United States Supreme Court in *Florida v. Royer*, 103 S.Ct. 1319 (1983), as such concept has been regularly utilized by law enforcement agencies when asked to articulate for the court that which they felt to be reasonable suspicion that the accused was violating the law. A more definitive and enthusiastic criticism of the "smuggler's profile" concept was rendered by the Eleventh Circuit Court of Appeals in 1983 in *United States v. Berry*, 670 F.2d 583. At page 600 of the Berry opinion the Eleventh Circuit, sitting *en banc*, recognized the vagueness of the factors relied upon by law enforcement officers who testified concerning the presence or absence of various aspects of the much maligned profile and said:

". . . We conclude that the profile is nothing more than an administrative tool of the police. The presence or absence of a particular characteristic on any particular profile is of no legal significance in the determination of reasonable suspicion.

**27**

. . . rather critical to any finding that reasonable suspicion existed is an evaluation of the reasonableness of a particular search or seizure in light the particular circumstances.

. . . A profile does not focus on the particular circumstances at issue. Nor does such a profile indicate in every case that a specific individual who happens to match some of the profile vague characteristics is involved in actions sufficiently suspicious as to justify a stop."

In the matter now before the Court, at a time of the year when the weather in Florida is notable for its humidity and warmth, the physical act of sweating is designated as a suspicious condition. Further, notwithstanding the fact that portable pagers worn on one's belt are a part of the habitual dress of thousands of people in Broward County, the presence of such beepers, according to Mr. Green, alerted the defendant herein that Mr. Green and his colleagues were law enforcement officers and thereby generated such anxiety within the defendant that the defendant produced abnormal amounts of perspiration. The presence of such beepers, according to law enforcement officers, generated so much anxiety within the defendant that the defendant was unable to take his eyes away from Mr. Green and his colleagues. If one is to accept testimony of this type as formulating the basis for reasonable suspicion that the one demonstrating such behavior is worried about police apprehension, then it is necessary to believe that any time one party constantly gazes upon another party such party's action suggests a situation wherein the gazer is worried that the gazee is a law enforcement officer.

The State has agreed, in writing, that there was no discrepancy between the identification offered to Mr. Green by the defendant and the information contained on the defendant's train ticket. Additionally, it is agreed by the State that the defendant did not attempt to flee nor did he give conflicting or evasive information to the agents in an attempt to deliberately conceal his conduct. If the factual statement offered by the defendant is correct, then upon what basis does the State seek to justify, in law, the direct order from Agent Green to the defendant that the defendant would not be permitted to depart the area until after such time as a trained narcotics dog had the opportunity to sniff the defendant's luggage?

The constitution of the United States guarantees every person within this country, regardless of citizenship or national allegiance, the right to be free from unreasonable searches and seizures. This cornerstone of our democracy is articulated in the Fourth Amendment of the United

28

States Constitution and it is emblazoned upon the Constitution of the State of Florida by virtue of the language contained in Article I, Section 23 of the Constitution of this State. By an amendment adopted in 1982, Article I, Section 12 of the Florida Constitution is to be interpreted in a manner consistent with, and according to the dictates of, the United States Supreme Court when it construes the Fourth Amendment of the United States Constitution. The United States Supreme Court, in 1968, speaking in *Terry v. Ohio*, 392 U.S. 1 and again in *Reed v. Georgia*, 448 U.S.438 (1980) expressly stated that at the time a "seizure" is made, it must be based upon a reasonable suspicion created by specific and articulable facts. The question that necessarily arises in the case now before the Court is at just what point did the "seizure" occur. This Court is of the opinion that a seizure occurs when one's freedom of movement is restrained, a concept with which, apparently, the Eleventh Circuit Court of Appeals agreed in *United States v. Waksal*, 709 F.2d 653 (1983). The *Waksal* Court made it abundantly clear that:

". . . if the police, for example, do not interfere with a traveller's progress, do not summon those indicia of authority tending to cause anxiety among citizens, and delay a traveller for only a brief time, a stop could be of such limited scope, and so noncoercive that it would not envoke the Fourth Amendment."

"On the other hand, several factors may indicate police conduct so coercive that a reasonable person, regardless of the overt indications of his or her will, would not feel free to ignore police questioning and simply walk away. Among the more significant of these factors, according to the *Berry* court are whether the police: physically block an individual's path; place implicit restraints on a citizen's freedom by retaining his or her ticket for more than a minimal amount of time or by taking the ticket over to an airline ticket counter; intimate that an investigation has focused on an individual; or to indicate that a failure to respond to questioning or a request to search suggest guilt." *Waksal* at page 658 quoting *Berry*, 670 F 2d at 597.

The United States Supreme Court, speaking in *United States v. Place*, 103 S.Ct. 2637 (1983), made it clear that the Fourth Amendment of the United States Constitution (and, by virtue of the Amendment to the Florida Constitution, Article I, Section 12 as well) does not prohibit law enforcement authorities from temporarily detaining *personal luggage* for exposure to a trained narcotics detection dog on the basis of *reasonable suspicion* that the luggage contains narcotics. The *Place* court also held that the exposure of luggage which is located

29

in a public place to a trained canine does not constitute a "search" within the meaning of the Fourth Amendment. In the matter now before the Court, however, we are not confronted with just the seizure of luggage, and the subsequent exposure thereof to a trained narcotics dog, but what appears to be an *arrest* predicated upon nothing more than the law enforcement officer's conclusion that the defendant met, at least in part, the "smuggler's profile".

According to Article I, Section 23, made a part of the Florida Constitution in 1980, every person has the right to be let alone and to be free from governmental intrusion into such person's private life unless otherwise specified within the law. As articulated in *Payton v. New York*, 100 S.Ct. 1371 (1980), the Fourth Amendment of the United States Constitution applies equally to seizures of persons and to seizures of property. The warrantless arrest of a person is a species of seizure required to be reasonable. Thus when one reads Article I, Section 12 of the Florida Constitution (and its Federal equivalent, the Fourth Amendment of the United States Constitution) in conjunction with Article I, Section 23 of the Florida Constitution, it becomes somewhat obvious that the State of Florida intends to stand vigilant in its protection of an individual from inappropriate and what appears to be legally unfounded, detention by law enforcement officers.

The State of Florida has agreed with the Defendant's factual allegation that the Defendant was instructed by Agent Green that the Defendant, himself, would be detained in order that the police dog could be brought to the scene. This detention of the Defendant created a situation wherein the Defendant was required to miss his train. There is also no allegation by the State that Mr. Green advised the Defendant that only the luggage would be detained for the brief period of time necessary for the dog sniff to occur and that if the dog sniff failed to disclose the presence of narcotics, the Defendant's luggage would be forwarded to him in an appropriate manner. Thus Court is of the opinion that Mr. Green exceeded his authority when he, based solely upon the existence of the "smuggler's profile" detained the Defendant and prohibited the Defendant from continuing upon his way, particularly in light of the fact that the Defendant expressly told Mr. Green that he, the Defendant, would not give his consent to a warrantless search of the luggage in question. The physical detention of the Defendant in this cause clearly violated the limitations expressed in *Dunaway v. New York*, 442 U.S. 200 (1979) and *Terry v. Ohio*, 392 U.S. 1, (1968).

## CONCLUSION

The foregoing analysis considered, Defendant's Motion to Suppress should be, and the same hereby is, GRANTED.