**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Ramon MILIAN–RODRIGUEZ,**
**Defendant-Appellee,**

No. 84–5174.

United States Court of Appeals,
Eleventh Circuit.

May 13, 1985.

Stanley Marcus, U.S. Atty., Stephen Schlessinger, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellant.

Barbakoff & Schwartz, Fred A. Schwartz, Miami, Fla., for defendant-appellee.

Before FAY and JOHNSON, Circuit Judges, and DYER, Senior Circuit Judge.

JOHNSON, Circuit Judge:

In this case, the government appeals from the suppression of evidence, including drugs and firearms, which was to be used in the prosecution of Ramon Milian-Rodriguez for drug and currency violations. Because we conclude that the relevant searches were conducted pursuant to probable cause, exigent circumstances, or the broad-ranging consent of a suspect who hoped to strike a deal with the government, we reverse.

## I. THE FACTS

Beginning in November 1982, agents in Operation Greenback, a Miami-based federal task force investigating currency violations, received information from law enforcement authorities that Ramon Milian-Rodrigeuz (hereinafter "Milian") was travelling periodically to Panama with extremely large sums of United States currency. A record check revealed that neither Currency Transaction Reports nor Currency and Monetary Instrument Reports had been filed as required, either by Milian or Cambios Monetarious Internacional, the Panamanian currency exchange with which he was associated. Accordingly, Milian was placed under scrutiny.

On two occasions in April 1983, law enforcement agents observed the loading of suspicious cargo aboard Milian's Lear Jet, which was bound for Panama. Agents of the Drug Enforcement Administration ("DEA") subsequently confirmed that the cargo contained United States currency, as to which none of the required reports had been filed. In May 4, 1983, law enforcement agents, having been informed that Milian would be making another trip to Panama, saw his jet being loaded in the same manner they had observed the previous month. Once again, no currency reports had been filed. On this occasion, the jet was stopped, passengers and crew were removed and the cabin was searched. The search revealed $5,447,949 in United States currency stowed within the cabin. Milian's attache case, also on the plane, contained detailed records relating to his money-smuggling activities and documenting the transportation to Panama of approximately $146 million between August 1982 and April 1983. These items were subsequently taken to the downtown Miami office of Operation Greenback.

While this search was underway, Milian was taken to an office located in the airport complex. He was told that he would be detained during the search, but that he was not under arrest. During this time Milian stated to a law enforcement officer that he wished to speak with the agent in charge. Arrangements were made for the ranking officers of the Customs Service on the scene to speak with Milian in a room at the airport leased by Milian's company, Consolidated Courier Service. Before entering this room, Milian executed a form giving the agents general authorization to search those premises.

When the Customs officers arrived, Milian informed them that "they didn't know what they had here." He boasted that he was the most sophisticated suspect with whom they had ever come in contact, and that he could provide them with a rare "opportunity" to survey the workings of an international narcotics and currency-laundering network. Anticipating an inculpatory statement, the Customs officers summoned the Assistant United States Attorney assigned to Operation Greenback and read Milian his rights. Milian stated that he had foreseen his eventual apprehension and had determined that when the day came he would offer his full cooperation. He stated to the assembled officials that he would provide information on the full range of criminal activities in which he had been involved if the government would not file criminal charges and would protect his anonymity as an informant. The agents explained to Milian that they lacked the authority to enter into any agreement, but that the government would consider his offer if the information he could provide was of "great interest." The law enforcement officials informed Milian that he was free to go, but he expressed his eagerness

to accompany them to the office of Operation Greenback.

After arriving at Operation Greenback, Milian executed a written consent authorizing the search of his business premises at 2852 Shipping Avenue. This form stated, *inter alia*, "These (officers or agents) are authorized by me to take from my premises any letters, papers, materials or other property which they desire." There was no discussion of any spatial limitations on the search. After several hours of discussion concerning the currency-smuggling operations with which Milian was involved, IRS Special Agent Raul de Armas asked to speak with Milian about currency laundering in general and three individuals who were under investigation for participation in laundering activities. Milian indicated that these individuals were drug dealers and clients of his, and he provided some details on the methods he used to launder funds. But he declined to give Armas further details pending a decision on his offer of cooperation.

At approximately 7 p.m., when this discussion had concluded, Milian volunteered to accompany the agents who were to conduct the search of his business premises. Following their arrival, the agents surveyed the premises to determine how long the search would take, and subsequently began in Milian's office. Milian was in all respects cooperative, retrieving files relating to those individuals about whom he had been questioned by Armas and assisting the officials in locating any documents they wished to see. The agents began to photocopy the files, and when this proved too slow, brought in a high speed copier. At approximately 7:30 p.m., agents in Milian's presence attempted to open the door to a closet adjacent to Milian's desk. The door was locked and Milian volunteered that the key was in his briefcase. (The briefcase had been taken from the plane earlier that day and was at that time at the Operation Greenback office). The agents made no further attempts to open the closet at that time. At approximately 10:00 p.m., Milian decided to depart the premises. He was told that the agents would remain at the office, as there was a great deal more

photocopying to be completed. At approximately 11:45 p.m., Milian called to inquire as to the progress of the search. He was told that, as the agents were copying all of the documents in his office, it appeared unlikely that the search would be completed by morning.

At 12:15 a.m., the agents opened the door to the closet in Milian's office by picking the lock. After opening the door Agent Heims observed an unlocked safe, from which he removed United States currency and bonds. He then noticed a duffle bag marked "Uzi," which he removed from the closet and unzipped, revealing an Uzi machine gun. A second duffle bag was removed and found to contain additional firearms. Agent Heims then observed a partially opened duffle bag which appeared to contain a white substance. The bag was removed and subsequent field tests revealed that it contained 62 pounds of cocaine.

After the discovery of these objects in the closet, and consultation with two Assistant United States Attorneys, the agents executed a warrantless arrest of Milian. At approximately 3 a.m., four federal agents and a uniformed local police officer arrived at Milian's home. When they rang the doorbell, Milian appeared, partially clad, behind the burglar bars at the door. The agents instructed him to ask his wife to bring the keys. Milian's wife opened the bars, and the agents immediately entered the house and handcuffed Milian. He expressed his surprise at the arrest, given his belief that they had some sort of agreement, and he asked what had prompted the arrest. When informed of the discovery of the cocaine Milian replied that he had forgotten about it. The officers then asked Milian for permission to search his residence. He stated that there was nothing of interest, but signed a written consent form without objection. The ensuing search revealed additional firearms and almost $40,000 in counterfeit United States currency.

Milian was taken to United States Customs headquarters and advised of his

rights, both orally and through an advise of rights form. Milian subsequently informed the agents that the cocaine discovered was the unsold portion of a 500 kilogram sale which had occurred 30 to 45 days previously. He executed another consent to search form for a warehouse in which he held an interest and which he identified as the source of the cocaine seized from his closet. He also identified the source and distributors for a large scale narcotics operation. Milian explicitly rejected an opportunity to call his attorney. Because of the magnitude of the crimes in which he had participated and his failure to inform agents of his cocaine cache, Milian's offer of cooperation was rejected and his arrest completed.

### A. Course of Proceedings

A 62-count indictment was filed in the United States District Court for the Southern District of Florida which charged Milian with, *inter alia*, illicit transportation of drug proceeds, possession of cocaine with intent to distribute, possession of counterfeit currency, racketeering, foreign travel in aid of racketeering, and failure to file appropriate currency reports. Milian moved to suppress virtually all the evidence which had been produced in the course of the investigation. A hearing was held between January 9, and 12, 1984. On February 1 and 2 the district court granted Milian's motion to suppress the evidence seized pursuant to the search of his business premises and his residence, and the statements made at the Customs office; the court denied Milian's motion to suppress the evidence seized from the search

of his plane. On February 28, 1984, the United States filed a motion to reopen the record and for reconsideration of the court's suppression rulings. That motion was denied by the district court on March 5, 1984. On March 8, 1984, the government filed a notice of appeal pursuant to 18 U.S.C.A. § 3731.

## II. THE SUPPRESSION ORDER

### A. Search of Office Closet

 The government first challenges the suppression of the items seized from the closet at Milian's business premises.[1] With respect to these items, the district court stated:

I find that the defendant voluntarily allowed the brief search in the room above the airport and agreed as part of his negotiations with the agents to allow a search at least of the files and records in his office ... I would find that the files that were copied over the long period of time—I think perhaps that took all night—that there was a consent given by the defendant to allow that ... However, it did seem to me that the Government went beyond that when it picked the lock on the door some time late in the evening, that that was beyond the scope of the consensual search. And I think the record reflects clearly that the search that was consented to, the defendant was talking about files and records and not the right to go and pick the lock on his closet. Certainly, the Government could have gotten a search warrant, had lawyers available, tired though they may

---

**1.** Milian argues that the appeal taken by the government was not timely because it was filed within thirty days after the denial of the government's motion to reopen the record and reconsider, but not within thirty days of the original suppression order. *See* 18 U.S.C.A. § 3731 (appeal within 30 days of "a decision judgment or order of a district court dismissing an indictment"); Fed.R.App.Proc. 4(b) (appeal within thirty days "after entry of the judgment or order appealed from"). This claim has little merit. The case law clearly establishes that the timely filing of a motion for rehearing can render the dismissal of an indictment non-final, and extend the period during which an appeal may be taken, regardless of whether such extension is ex-

plicitly sanctioned by any statute or rule. In such cases the period of limitation runs from the date on which the motion for rehearing is denied, not from the date on which the indictment was originally dismissed. *United States v. Healy*, 376 U.S. 75, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964); *United States v. Dieter*, 429 U.S. 6, 97 S.Ct. 18, 50 L.Ed.2d 8 (1976). In *Dieter* the Supreme Court applied the *Healy* rule to a motion to "Set Aside the Order of Dismissal," which, it explained, was not formally the same as a motion for rehearing, but had the same effect. This holding indicates that the *Healy* rule is applicable to appellant's motion to reopen and reconsider, which serves a similar purpose, and that the appeal was timely filed.

have been, during that day. I would go ahead, based on that, I would suppress whatever evidence was in the closet. Milian adds that the agents' consistent focus on the files and ledgers in which his money-laundering operations were recorded demonstrates that the government's interest was limited to the records stored in his office. The government argues that the district court erred in suppressing this evidence because the consent given by appellee extended to his entire business premises, and because appellee manifested his consent to the search of the closet by telling agents the location of the key.[2]

█ A suspect's consent can impose limits on the scope of a search in the same way as do the specifications of a warrant, *see Mason v. Pulliam,* 557 F.2d 426 (5th Cir.1977). Moreover, the government may not use consent to a search which was initially described as narrow as license to conduct a general search, *See United States v. Dichiarinte,* 445 F.2d 126 (7th Cir.1971). There is no basis, however, for concluding that either of these principles was violated in the instant case. Although the discussion during the afternoon focused on the material that would be provided by records and files, the form signed was general; and there was absolutely no discussion of any limit on the search or on the nature of the items to be inspected.

Moreover, the execution of the consent form was part of Milian's on-going effort to cooperate with the police. Because the agents would not make a deal except for material of "great interest," Milian had strong incentive to grant an authorization which was as broad as possible. Finally, even if the search had been limited to records and files, the search of the closet would not necessarily have been invalid. As the closet was immediately adjacent to Milian's desk, it would have been entirely reasonable to believe that there might be files and records stored inside it. *Cf. United States v. White,* 706 F.2d 806, 808 (7th Cir.1983) (applying "objective reasonableness" standard of *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168) (search of travel bag valid because reasonable to think narcotics might be hidden there). Thus the district court's finding that consent was limited to files and books was clearly erroneous.

█ The district court's error in suppressing the evidence is also demonstrated by the exchange which took place between Milian and the agents concerning access to Milian's closet. While Milian was still present in the office, agents attempted to open the closet adjacent to the desk. When they found it was locked, Milian advised them that the key was in his briefcase (which had been taken from Milian's plane

---

**2.** The government also argues that the search falls within the good-faith exception to the exclusionary rule established in *United States v. Leon,* and that the search is protected by the "inevitable discovery" rule recently announced in *Nix v. Williams.* The first claim is without merit. The good-faith exception exclusionary rule is not broad enough to cover the circumstances of this search. The rule announced last term in *United States v. Leon,* ―― U.S. ――, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), applies to "officers acting in reasonable reliance on a warrant issued by a detached and neutral magistrate but ultimately found to be invalid." The version of the rule relied upon by the former Fifth Circuit in *United States v. Williams,* 622 F.2d 830 (5th Cir.1980), also applies to the reliance of officers on a statute which is later held unconstitutional or a court precedent which is later overruled. *Id.* at 841. The good faith exception has not been applied to those circumstances in which there is a question as to the scope of a consensual search.

The government's claim with respect to the "inevitable discovery" rule has greater plausibility. That rule, which was adopted by the Supreme Court in *Nix v. Williams,* ―― U.S. ――, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), states that, where the evidence would inevitably have been discovered by lawful means, it need not be suppressed, though official misconduct may have occurred in securing it. Because Milian informed officials of the location of the keys which would open the closet, it appears that the lawful discovery of the cocaine and firearms may have been "inevitable": police simply had to retrieve the keys from the briefcase at Operation Greenback and open the closet. But because, as will be discussed *infra,* Milian's statement concerning the location of the keys manifested his consent to the search of the closet, we need not reach the applicability of the "inevitable discovery" rule.

to the Operation Greenback office). By describing the location of the keys which would provide entry into the closet, Milian provided additional evidence of his consent to the search. *Cf. United States v. Allison*, 616 F.2d 779, 782 (5th Cir.), *cert. denied*, 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72 (1980) (consent indicated by presentation of keys to law enforcement officials). Appellant argues that this case is distinguishable from cases such as *Allison* in which the keys are physically presented and more closely analogous to cases in which the defendant gives a qualified or equivocal response and fails to present officials with the keys. *See United States v. Patacchia*, 602 F.2d 218, 219 (9th Cir.1979) (defendant expresses willingness but inability to open trunk because of damage to rear of car and absence of trunk key); *cf. United States v. Ester*, 442 F.Supp. 736, 738 (S.D.N.Y.1977) (defendant says nothing but permits law enforcement agent to retrieve key from defendant's pocket). This claim, however, has little merit. Milian was unable to present the keys, as the briefcase had been taken to Operation Greenback, but there was nothing equivocal in his response: the agents were fully aware of the location of the briefcase, and Milian knew this when he provided the information. Providing officials with the information necessary to gain access to the closet was, moreover, fully consistent with Milian's comprehensive attempt to cooperate with law enforcement efforts. Not only the generality of Milian's written consent but his oral response to official efforts to search the closet indicate that the district court's suppression of its contents was clearly erroneous.

### B. Arrest and Residential Search

The government also challenges the suppression of the firearms and counterfeit currency found at Milian's home following his arrest. With respect to the items seized following Milian's arrest, the district court stated:

It seems to me that the easiest question that was presented was the conduct of the government at the defendant's house when the search was made early in the morning. I find that there really was no excuse for not getting a warrant to search the house under the circumstances … I realize there was a consent given by the defendant after he was awakened at 3:00 o'clock in the morning under what I would consider extreme conditions where people—law enforcement officers were at both sides of the house with weapons drawn. I find that, if the Fourth Amendment means anything at all today, that sort of activity should be prohibited. Therefore, I would suppress everything that was found in the house.

(Hearing Transcript at 6–7). Milian argues that the suppression was appropriate, as his warrantless arrest violated the Fourth Amendment protections recognized in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and rendered the subsequent, ostensibly consensual search of his home invalid. The government claims that suppression was improper under this Circuit's construction of the *Payton* rule.

■ The Supreme Court has held that the Fourth Amendment prohibits police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest. *United States v. Payton*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). *Payton* makes clear, however, that such an entry may be proper where probable cause to arrest the suspect exists and there are exigent circumstances making it impossible or imprudent for a warrant to be obtained. 445 U.S. at 588, 100 S.Ct. at 1381 (approving *Dorman v. United States*, 435 F.2d 385 (D.C.Cir.1970) (en banc)), 590. This Circuit has recognized circumstances sufficiently exigent to justify warrantless entry where law enforcement officials are in "hot pursuit" of a suspect, *United States v. Burgos*, 720 F.2d 1520 (11th Cir.1983) (citing *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976)), where a suspect has undertaken to flee the jurisdiction, *United States v. Mesa*, 660 F.2d 1070 (5th Cir. Unit B 1981), where the suspect presents a danger to arresting officers or to the public, *United States v. Burgos, supra* (citing

*Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)), or where there is a risk of the destruction or removal of narcotics, *United States v. Burgos, supra.*

It is clear that the government had probable cause to arrest Milian; a machine gun, other firearms and 62 pounds of cocaine had been discovered in the closet of his office. Moreover, several of the exigent circumstances recognized by this Circuit were present at the time of the arrest. During the discussion at Operation Greenback, Milian had mentioned flight as an alternative he would consider if the government did not accept his offer of cooperation. The officers had legitimate reason to suspect that Milian would reconsider his position and flee the jurisdiction if he were not promptly placed under arrest. The discovery of several dangerous firearms at Milian's office also led agents to believe that Milian was holding additional weapons at his home, presenting a danger to arresting officers and to the public. *Cf. Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (presence of numerous weapons in suspect's home justified entry without arrest warrant). Finally, and perhaps most importantly, agents knew that Milian was in possession of large quantities of narcotics; he had strong reason to destroy or remove any drugs outside his office before the investigation progressed further, as their discovery would imperil his chances of striking a deal with the government. Indeed Milian's 11:45 p.m. call to the officers at his business premises evinced his concern with what they may have discovered; it may also have raised suspicions that Milian would use the time during which officials were otherwise occupied to dispose of any additional incriminating evidence. These factors demonstrate that Milian's arrest, though warrantless, was not a violation of his rights under *Payton.* Under these circumstances, Milian's consent to the subsequent search was valid, and the suppression of the items seized was error.

C. Statements at the Customs Office

The government finally challenges the suppression of incriminating statements made by Milian to Customs officials after he was taken from the scene of the arrest to the Customs office. Milian claims that these statements, some of which concerned the cocaine found in his office, were properly suppressed, as they were tainted by the illegal character of his arrest. As we hold that Milian's arrest was within the limits imposed by *Payton,* there is no basis for concluding that his statements at the Customs office were tainted. However, even if there had been misconduct in the initial arrest, it would not have affected the subsequent statements under the circumstances of the instant case. Not only did a full hour elapse between the arrest and the time at which the statements were made, but law enforcement officials had removed Milian from the scene of the arrest, and had administered the *Miranda* warnings on two separate occasions before the interview at the Customs office began. *See Brown v. Illinois,* 422 U.S. 590, 602–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975) (circumstances to be considered in determining whether statement was "sufficiently an act of free will to purge the primary taint" are temporal proximity of arrest and confession; presence of intervening circumstances; and purpose and flagrancy of official misconduct). Any compulsion Milian felt to speak at the Customs Office arose from the mistaken impression that cooperation might still be in his interests, not from the circumstances of his arrest. The district court erred in suppressing Milian's inculpatory statements.

The suppression orders of the district court are REVERSED and the case is REMANDED for further proceedings consistent with this opinion.