UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,

v.

Luis Fernando DE LA ROSA, Defendant–Appellant, Cross–Appellee.

No. 89–5517.

United States Court of Appeals, Eleventh Circuit.

Jan. 28, 1991.

Roy J. Kahn, Miami, Fla., for defendant-appellant, cross/appellee.

Carol A. Wilkinson, Harriett Galvin and Linda Collins Hertz, Asst. U.S. Attys., Mia-

mi, Fla., for plaintiff-appellee, cross-appellant.

Before CLARK, Circuit Judge, MORGAN and HILL*, Senior Circuit Judges.

MORGAN, Senior Circuit Judge:

Appellant, Luis Fernando De La Rosa, was charged with conspiracy to possess cocaine with intent to distribute, conspiracy to commit money laundering, possession of cocaine with intent to distribute, and money laundering. Following the denial of his pretrial motion to suppress certain evidence seized and statements made by him on the night of his arrest, appellant entered a negotiated guilty plea to money laundering, reserving the right to appeal the denial of his motion to suppress. The district court imposed a Guidelines sentence of 87 months imprisonment followed by two years supervised release. Appellant now appeals the denial of his motion to suppress. The government cross-appeals, alleging that the district court misapplied certain sections of the Federal Sentencing Guidelines in arriving at the sentence. We affirm the judgment of conviction and the sentence imposed by the court.

## MOTION TO SUPPRESS

The following facts, which we find to be supported by the record, are taken primarily from the order of the district court on the motion to suppress:

On July 6, 1988, at about 9:15 p.m., Metro Dade police officer Nick Anagnostis observed a Latin male, Raphael Bustamante, using a public telephone located at the Town and Country Mall in Miami, Florida. After Bustamante finished using the telephone, he entered the passenger side of appellant's rental vehicle. At this time, Anagnostis and two other police officers in unmarked cars began to follow appellant's vehicle. Appellant subsequently dropped Bustamante off at the Promenade Apartments in Miami, Florida. Appellant proceeded to his apartment across the street and used a special pass in order to open a security gate into the parking lot. Before the gate closed, one of the police officers, Detective Tom Gross, entered the complex. After appellant parked and began walking toward his apartment, Detective Gross positioned his unmarked police car directly behind appellant's vehicle, approached appellant, identified himself as a police officer, and asked appellant if he could speak with him. Appellant agreed. Detective Gross was dressed in plain clothes and carried a holstered firearm. At Gross's request, appellant produced identification, a Georgia driver's license. Before returning appellant's license, Detective Gross asked for and received permission to search appellant's vehicle. At this time, detective Anagnostis arrived at the scene and parked a couple of parking spaces away from appellant's car. Detective Gross then handed Detective Anagnostis appellant's license and proceeded to search the vehicle.[1]

During the search, Detective Gross discovered a notebook in the back seat of the car and, after reading its contents, concluded that the inscriptions in the notebook related to narcotics transactions. The officers then asked appellant if he would show them where Bustamante lived and stressed that he did not have to consent to this request. Appellant replied that he understood, but that he would take them to Bustamante's home anyway. Detective Anagnostis and another police officer, Detective Haines, placed appellant in one of the unmarked cars and proceeded to Bustamante's apartment. No contraband was found at Bustamante's apartment and appellant was then taken back to his apartment where the officers asked if they could search his residence. Appellant was in-

---

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

1. Based on our review of the record we are unwilling to state that the district court's finding that the driver's license was held during the search of the vehicle was clearly erroneous; however, we do note that Detective Gross unequivocally testified that he returned the driver's license before asking for permission to search the vehicle.

formed that he did not have to consent to this search and, as he had done throughout the encounter, he consented.

During the search, the officers found approximately $378,000, an electric money counting machine, rubber bands and other ledgers. Defendant was placed under arrest for violation of Florida state law prohibiting conspiracy to traffic in narcotics and was advised of his Miranda rights. Appellant then stated that he was in the cocaine business but did not deal directly with the drugs and that he only handled money. Appellant stated that the detectives had missed some currency at Bustamante's apartment and that there was another apartment that he knew of which should have both cocaine and cash. The officers returned to Bustamante's apartment, and upon entering, observed Bustamante burning paper. After searching both Bustamante's apartment and the other apartment identified by appellant, the officers found one kilogram of cocaine and more cash.

Appellant sought to suppress the notebook found in his automobile, the records, currency and other related items found in his apartment, and all statements, admissions and confessions which he made on the night of his arrest.

■ It is axiomatic that not every encounter between law enforcement officers and a citizen in a public place constitutes a seizure within the meaning of the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). The police can be said to have seized an individual if, in view of all the surrounding circumstances, a reasonable person would believe that he was not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (*citing United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). This is necessarily an imprecise test. *Id.* Some specific factors may be considered in mak-

ing this inquiry, including: whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police. *See United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir.1984).

■ Applying these factors to the instant case, the district court determined that the initial encounter between appellant and the officers was a non-coercive encounter to which the Fourth Amendment did not apply. It made this finding, despite its somewhat questionable factual conclusion that the detectives retained appellant's driver's license at the time they asked permission to search his car. The district court found that appellant "had returned home for the evening, and was not anticipating using the automobile in the immediate future," and determined that under these facts a reasonable person would believe he was free to walk into his home and avoid further conversation with the police. We agree with the district court that even though the defendant's driver's license may have been temporarily retained, a reasonable person, under the totality of the circumstances, would have believed he was free to leave.[2]

■ We decline to accept appellant's argument that the existence of the security gate at the entrance to the parking lot of his apartment complex transforms that parking lot from a public into a private area. Likewise, we decline appellant's invitation to remand this case to the district court for consideration of whether the initial encounter and search was lawful under state standards. The admissibility of evidence in a federal prosecution is governed by federal law, rather than state law. *United States v. Mastrangelo*, 733 F.2d 793, 799 (11th Cir.1984). "In determining whether there has been an unreasonable

2. *United States v. Thompson*, 712 F.2d 1356, 1361 (11th Cir.1983) does not require a different result, because, unlike the defendant in *Thompson*, appellant had already exited his vehicle and

was proceeding toward his home for the evening. Thus, temporary retention of the license did not preclude appellant from terminating the encounter by going into his apartment.

search and seizure by state officers a federal court must make an independent inquiry ... The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Elkins v. United States,* 364 U.S. 206, 224, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960).[3]

■ Appellant also argues that even if he was not seized for Fourth Amendment purposes at the time he consented to the search of his automobile, his consent did not extend to the contents of the notebook found in the back seat. A consensual search is confined to the terms of its authorization. *United States v. Blake,* 888 F.2d 795, 798 (11th Cir.1989). At bar, we find that appellant voluntarily consented to a search of the interior of his automobile and placed no special restrictions on that search. Thus, it was reasonable for Detective Gross to open the notebook which he found lying on the seat. *Compare United States v. Milian–Rodriguez,* 759 F.2d 1558, 1563 (11th Cir.) (upholding search of locked closet after defendant gave voluntary consent to search his house), *cert. denied,* 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 112 (1985).

■ Finally, we reject appellant's contention that his consent to search his apartment and all of the statements by him made after he accompanied the officers to Bustamante's apartment, were somehow involuntary because he had been removed from the site of the initial encounter. The only case cited by appellant in support of this argument, *United States v. Waksal,* 709 F.2d 653, 659 (11th Cir.1983) is factually inapposite. *Waksal* and the cases cited therein deal with individuals who accompany police officers away from the public area of an initial encounter to a private area for further questioning. Here, appellant was not taken off for further interrogation, rather, he voluntarily complied with the officers' request that he show them where Bustamante lived. *Compare Id.*

For these reasons, we find that the motion to suppress was properly denied by the district court.

## SENTENCING GUIDELINES

■ By cross appeal, the government argues that the district court misapplied the Sentencing Guidelines in three respects. First, the government contends that the district court misapplied the "relevant conduct" provision of Guideline § 1B1.3(a) by failing to consider the amount of money involved in the total scheme rather than just the funds attributable directly to appellant. The district court enhanced appellant's base offense level by three levels based on a finding that the amount of money involved in the money laundering scheme was between $350,001 and $600,000. The government contends that the amount of money involved and attributable to appellant exceeded $600,000 and required a four level increase.

The government bore the burden of proof on this issue by the preponderance of the evidence. *United States v. Alston,* 895 F.2d 1362, 1371 (11th Cir.1990). We review the district court's determination of the amount of currency involved under a clearly erroneous standard. *United States v. Wilson,* 884 F.2d 1355, 1357 (11th Cir.1989).

Our review of the sentencing transcript convinces us that the district court understood that it was required to consider the total amount of funds that it believed was involved in the course of criminal conduct. In its calculation of the amount of money involved the district court included the funds seized at De La Rosa's apartment on the night in question and the monies he admitted delivering that day. Based on our review of the record and the evidence presented at the sentencing hearing, we cannot say that this determination was clearly erroneous.

■ The government next argues that the district court misapplied the Guidelines pertaining to appellant's role in the offense

---

**3.** Moreover, having determined that no *Terry*-type stop occurred, it is unnecessary to consider Florida law as it pertains to warrantless arrests or investigative detentions as appellant would have us do.

and states that the district court should have increased the offense level by three levels based on appellant's role as a high level manager in a criminal enterprise involving five or more participants. The district court increased the offense level by only two levels which would apply to a defendant who is an organizer, leader, manager, or supervisor in criminal activity which involved less than five participants. Guideline § 3B1.1(c). The government contends this finding lacks foundation in fact and is therefore clearly erroneous. We disagree. The language of Guideline § 3B1.1 requires that the sentencing court focus on the defendant's role in the offense of conviction rather than other criminal conduct in which he may have engaged. *See United States v. Williams*, 891 F.2d 921, 925 (D.C.Cir.1989); *United States v. Tetzlaff*, 896 F.2d 1071, 1075 (7th Cir.1990); *United States v. Pettit*, 903 F.2d 1336, 1341 (10th Cir.1990). Appellant's offense of conviction was money laundering as charged in count three of the indictment. In that count, he was alleged to have acted with two other individuals, Bustamante and De La Hoz. Whatever appellant's role in the other offenses charged in the indictment may have been, the government did not prove by a preponderance of the evidence that in committing the offense of conviction, appellant acted as a manager or supervisor of a criminal activity involving five or more participants.

█ Finally, the government takes issue with the district court's determination that appellant was entitled to a two level reduction for acceptance of responsibility pursuant to Guideline § 3E1.1(a). "The district court is in a unique position to evaluate whether a defendant has accepted responsibility for his acts, and this determination is entitled to great deference on review. Unless the court's determination is without foundation, it should not be overturned on appeal." *United States v. Campbell*, 888 F.2d 76, 78 (11th Cir.1989), *cert. denied sub nom., Blige v. United States,* —— U.S. ——, 110 S.Ct. 1484, 108

L.Ed.2d 620 (1990); *accord United States v. Pritchett,* 908 F.2d 816 (11th Cir.1990). The district court found that appellant was entitled to a two level reduction for acceptance of responsibility stating that, "this particular defendant really made the case for the government in the early stages." The record clearly reflects that appellant was extremely cooperative in the initial stages of this investigation and made it possible for the government to make the arrests in these cases. The government's theory that appellant should not benefit from this acceptance of responsibility because he cooperated only in the hope that he would avoid arrest does not persuade us to override the considered judgment of the district court on this issue.

For the foregoing reasons, the judgment and sentence of the district court are AFFIRMED.

CLARK, Circuit Judge, dissenting:

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." [1] In upholding the search of De La Rosa's car and residence, the majority ascribes to our fellow citizens a fortitude in the face of police-initiated encounters of almost Homeric proportions. The majority would have us believe that De La Rosa—blocked in by police vehicles that followed him through a locked security gate and confronted in his own parking lot by armed agents who demanded and retained his most valuable piece of personal identification—would feel free to walk blissfully away from these officers and continue on his own business. The law in this area unequivocally demonstrates that De La Rosa was "seized" without sufficient justification and that all fruits of this initial illegality must be excluded.

At the outset, it should be noted that if this encounter was considered a "seizure"

---

**1.** *United States v. Mendenhall,* 446 U.S. 544, 545, 100 S.Ct. 1870, 1872–73, 64 L.Ed.2d 497 (1980)

(opinion of Stewart, J.).

within the meaning of the fourth amendment, the police had neither reasonable, articulable suspicion nor probable cause to support the seizure of De La Rosa.[2] As the government admitted at the district court, the testimony adduced at the suppression hearing indicated that the police had no particularized and objective basis for seizing De La Rosa. The only activities observed by the police, while on routine patrol, were that an associate, Bustamonte, talked on a public telephone at a shopping mall for several minutes while De La Rosa waited in a car; that De La Rosa then drove Bustamonte to a place of residence; and that he then returned to his own home. Every observed act, whether viewed alone or in combination with each other, is consistent with innocent activity. Indeed, there is not even a hint on this record to suggest that the police had reasonable suspicion or probable cause to believe that De La Rosa was involved in any sort of criminal activity.[3]

Having framed the importance of the majority's determination that a "seizure" did not occur in this case, I find its opinion irreconcilable with this court's previous decision in United States v. Thompson.[4] In that case, Officer Kier, without suspicion of any criminal activity, approached the defendant Thompson who was sitting inside an automobile at an airport parking lot.[5] As he approached, Kier noticed that Thompson was holding a colored, circular object to his nose.[6] The officer asked for identification, and Thompson handed him his driver's license, which was retained throughout the encounter.[7] Suspecting that the object contained cocaine, Kier requested that Thompson hand him the vial and subsequently arrested him and secured consent to search the car, which later revealed more contraband.[8]

In finding that the defendant in Thompson had been "seized" within the meaning of the fourth amendment, we specifically noted that:

> when Kier requested the vial a reasonable person in Thompson's position would have believed that he was not free to leave.... Kier did more than simply request and examine Thompson's driver's license. The record shows ... that when Kier made the request he had not returned Thompson's driver's license.... *When Kier retained Thompson's license, the encounter matured into an investigative stop protected by the Fourth Amendment.* Without his driver's license Thompson was effectively immobilized. A reasonable person in these circumstances would not have believed himself free to leave.[9]

Our holding in Thompson was specifically premised on the Supreme Court's prior decision in Florida v. Royer,[10] in which it excluded evidence seized during an airport stop.[11] There, a majority of the Justices found that an initial encounter between

---

**2.** See United States v. Espinosa–Guerra, 805 F.2d 1502, 1506 (11th Cir.1986); United States v. Berry, 670 F.2d 583, 591, 598–603 (5th Cir. Unit B 1982) (en banc).

**3.** One police officer testified that he believed that De La Rosa had employed evasive driving tactics as a counter-surveillance measure. This same officer testified, however, that De La Rosa's activity at the shopping mall was not consistent with any form of drug activity. Yet, the fact that a suspect is evasive is alone insufficient to establish reasonable, articulable suspicion when there is no reasonable basis for suspecting *why* the suspect may be consciously evading a police officer. See United States v. Jones, 619 F.2d 494, 498 (5th Cir.1980). Indeed, since the officers testified that De La Rosa did not know that he was being tailed by the police, and that they were following in unmarked police vehicles, his particular driving technique may well have been consistent with innocent activity.

**4.** 712 F.2d 1356 (11th Cir.1983).

**5.** Id. at 1358.

**6.** Id.

**7.** Id.

**8.** Id.

**9.** Id. at 1359 (emphasis added); accord United States v. Elsoffer, 671 F.2d 1294, 1297 (11th Cir.1982).

**10.** 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

**11.** See Thompson, 712 F.2d at 1360.

DEA agents and the defendant was a "seizure":

> Asking for and examining [the defendant's] ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told [the defendant] that he was suspected of transporting narcotics, and asked him to accompany them to the police room, *while retaining his ticket and driver's license* and without indicating in any way that he was free to depart, [the defendant] was seized for purposes of the Fourth Amendment.[12]

Indeed, other circuits, which have considered the exact issue posed in *Thompson,* have reached similar results.[13]

In this case, the testimony of the officers at the suppression hearing indicated that they asked for identification from De La Rosa and, *while retaining his driver's license,* asked for consent to search the in-

side of his automobile.[14] Although this incident alone is sufficient to escalate this encounter to a "seizure" under *Thompson,* I find that this conclusion becomes irresistible when the totality of the circumstances faced by De La Rosa on that night are also considered.[15] The officers gained access to De La Rosa's apartment complex by following him through a controlled access security gate which was obviously designed to exclude the general public from the premises. In addition, when the encounter ensued, De La Rosa's car was effectively blocked on two sides by unmarked police vehicles without an avenue of exit. Finally, he was confronted by two police officers, both wearing holstered firearms in plain view and acting in an official capacity, who did not initially inform him that he could refuse to consent to a search of his car. Under such circumstances, I find the majority's conclusion that a reasonable person would *not* consider himself the focus of

**12.** *Royer,* 460 U.S. at 501, 103 S.Ct. at 1326 (plurality opinion) (emphasis added); *see also id.* at 511, 103 S.Ct. at 1331 (Brennan, J., concurring in the result).

**13.** *See United States v. Battista,* 876 F.2d 201, 205 (D.C.Cir.1989); *United States v. Cordell,* 723 F.2d 1283, 1285 (7th Cir.1983), *cert. denied,* 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984).

For example, the District of Columbia Circuit has noted that:

> [i]t is well-established that the mere request for identification does not inevitably give rise to a seizure. But once the identification is handed over to police and they have had a reasonable opportunity to review it, if the identification is not returned to the detainee we find it difficult to imagine that any reasonable person would feel free to leave without it.

*Battista,* 876 F.2d at 205 (citation omitted).

**14.** Although upholding the district court's factual determination of this point, the majority notes parenthetically that this conclusion was "somewhat questionable". However, the following colloquy at the suppression hearing with Officer Anagnostis, who was the officer responsible for writing the official police report of this incident indicates:

> Q: You came up to the car, Detective Gross tells you we could search the car. Is that your testimony?
> A: That's correct, yes.
> Q: After that, he also shows you a license?
> A: Correct.
> . . . .

> Q: After he tells you—he being Detective Gross—we could search the car, he also points out to you the license in his possession that shows Atlanta, Georgia, or it says Georgia?
> A: Yes.
> . . . .
> Q: Did you see how or where Detective Gross obtained items from the car [during the search]?
> A: I couldn't see.
> Q: Did you talk to my client during this time at all?
> A: I may have asked him if he lived there again. That was about it, or his driver's license. I may have asked him if he had a Florida license, or something like that.
> Q: Did you have possession of the Atlanta license at this time?
> A: Detective Gross handed it to me.
> Q: So you had possession of the Atlanta license while Detective Gross was searching?
> A: Yes.

**15.** *See United States v. Puglisi,* 723 F.2d 779, 783 (11th Cir.1984).

In *Puglisi,* we pointed to some specific factors that indicate whether a police-citizen contact is consensual or a seizure. These include: the suspect's age, education, and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect; the language and tone of voice of the police; whether the citizen's path was blocked or his progress impeded; and whether a plane ticket or identification was retained. *Id.*

an investigation and therefore free to leave to be without basis.[16]

Despite this court's view that the holding in *Thompson* was a "common-sense conclusion," [17] the majority completely sidesteps its relevance to this case. In a footnote, it attempts to distinguish *Thompson* on the grounds that:

> unlike the defendant in *Thompson*, appellant had already exited his vehicle and was proceeding toward his home for the evening. Thus, temporary retention of the license did not preclude appellant from terminating the encounter by going into his apartment.

Without even examining its legal basis, this distinction is flawed from the outset because there is no factual support in the record for the majority's adoption of the district court's determination that De La Rosa "had returned home for the evening, and was not anticipating using the automobile in the immediate future." The only person who could have conceivably had knowledge of this intention was De La Rosa, and he did not testify at the suppression hearing. There was no testimony at all from the police witnesses about De La Rosa's plans for the evening. It seems rather odd that the result in this case would be different under the majority's rationale if, for example, De La Rosa had indicated that he was returning home to feed his dog before driving out again.[18]

Putting these factual deficiencies aside, the majority's analysis misperceives the nature of the inquiry in determining whether a "seizure" has taken place within the meaning of the fourth amendment. The question to be resolved is not, as the majority poses it, whether a person is physically "preclud[ed] ... from terminating the encounter," but whether a reasonable person "would have *believed* that he was not free to leave." [19] Put more simply, the issue is one not of physical capacity, but of belief, objectively viewed. Indeed, in *Thompson*, we anticipated the very type of argument that the majority now deploys to distinguish that case and *expressly rejected* it. In analyzing the facts of *Royer*, we noted that:

> [i]n a purely physical sense, the retention of a person's airline ticket does not prevent him from leaving the company of law enforcement agents. He may, if he has sufficient funds, attempt to purchase another ticket and depart to his chosen destination. Or he may simply try to walk away, abandoning his plans to travel by air. But the cases ... hold that despite physical possibility of departure, a reasonable person whose airline ticket has been retained would not believe that the officers would permit him to depart.... *[T]he person whose driver's license has been retained can, in a physical sense, attempt to leave the scene. He can abandon his vehicle and walk away, or attempt to drive away.... [T]he legal issue is whether a reasonable person would believe that law enforcement officers would permit him to leave.*[20]

In light of this clear language, it is obvious that the majority's analysis of this question is flawed.

Finally, even if we accept the majority's view that De La Rosa intended to retire for the evening, its opinion is still inconsistent not only with the underlying rationale of *Thompson*, but also with the practical realities of such police encounters. In our society, the most valuable piece of personal identification possessed by most citizens is their driver's license. Because of the safeguards that most states employ in issuing

---

**16.** *See United States v. Kerr*, 817 F.2d 1384, 1386–87 (9th Cir.1987); *United States v. Pavelski*, 789 F.2d 485, 488–89 (7th Cir.), *cert. denied*, 479 U.S. 917, 107 S.Ct. 322, 93 L.Ed.2d 295 (1986).

**17.** *Thompson*, 712 F.2d at 1360.

**18.** In *Thompson* there was no indication that the defendant required his driver's license be-

cause he intended to drive way immediately. In fact, the defendant was found in a parked car that had already been parked in a short-term airport lot for two weeks. *See id.* at 1358.

**19.** *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877 (emphasis added).

**20.** *Thompson*, 712 F.2d at 1360–61 (emphasis added).

such documents, it is considered by merchants, employers, government officials, and other relevant persons as definitive proof of an individual's personal identity, age, and residence. Indeed, those who have been unfortunate enough to lose their driver's licenses know how completely disabled one is from participating in many of the incidents of everyday life, apart from driving. Thus, when a person is confronted by a police officer and hands over his license, the reasonable expectation of that person must be that he is not free to leave the officer's presence. By giving over what may be his only piece of personal identification to an agent of the state, that person knows that he is *effectively* immobilized even if he could physically walk away from the officer. Recognizing that fact, a person would not feel that he is free to stroll away, and, as a consequence, has been "seized" for purposes of the Fourth Amendment.[21]

Under the majority's view, De La Rosa and other similarly situated persons who intend to avoid a police encounter, should reasonably be expected to abandon their driver's license in the possession of a police officer, walk away, and perhaps apply for a new license another day. I find such a result completely at odds not only with ordinary experience, but, more importantly, the clear precedents of this court and the accepted constitutional analysis of this question. Because the majority clearly erred by abandoning principles of stare decisis in not applying a binding precedent of this court, I dissent.

---

21. Because De La Rosa was "seized" within the meaning of the fourth amendment and the seizure was unconstitutional, I would hold that all statements and evidence flowing from that initial illegality must be suppressed. *Royer*, 460 U.S. at 507, 103 S.Ct. at 1329; *Thompson*, 712 F.2d at 1361–62.