[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 18-13631
Non-Argument Calendar

————————————————

D.C. Docket No. 6:18-cr-00053-GKS-GJK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JONATHAN K. SIMMONS,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

(April 10, 2019)

Before WILLIAM PRYOR, GRANT and HULL, Circuit Judges.

PER CURIAM:

After a bench trial, defendant Jonathan K. Simmons appeals his conviction

for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

A police officer, responding to a broken-down vehicle call, found a loaded firearm

clipped to Simmons's waistband during a protective stop and pat-down search.  On

appeal, Simmons argues that the district court erred in denying his motion to

suppress because the officer's seizure of Simmons and pat-down search violated

the Fourth Amendment.  After review, we affirm.[1]

## I.  BACKGROUND FACTS

On January 1, 2018, at around 7:30 p.m., Deputy Carlos Roman was

dispatched to a broken-down vehicle sitting in the left turn lane of a divided

highway in Palm Shores, Florida.  Approaching the vehicle, Deputy Roman asked

a man sitting in the driver's seat, defendant Simmons, what was going on and

whether his car was broken down.  Defendant Simmons did not respond to his

questions.  Deputy Roman asked Simmons his name, and Simmons mumbled

something that Deputy Roman could not understand.  Deputy Roman then asked

Simmons for his driver's license, and Simmons began fumbling in his car, but did

not produce a driver's license.  As Deputy Roman scanned the inside of the vehicle

---

[1]We review a district court's denial of a motion to suppress under a mixed standard, reviewing the district court's findings of fact for clear error and its application of the law to those facts de novo.  United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000).  In doing so, "all facts are construed in the light most favorable to the prevailing party below," which in this case was the government.  See id.

2

with his flashlight, he noticed a metal clip above Simmons's pants line, which, based on his training and experience, Deputy Roman knew was the kind used to carry a knife or gun without a holster.

Deputy Roman "made a mental note" of the clip but continued to try unsuccessfully to communicate with Simmons. When he asked Simmons for his vehicle registration, insurance, and license, Simmons turned his back completely away from Deputy Roman in an unusual way so that Deputy Roman could not see his hands. After Simmons reached into his glove compartment and still did not produce identification, Deputy Roman asked Simmons again whether he had a driver's license, and Simmons sat back in his seat but remained "extremely uncommunicative." Deputy Roman told Simmons he needed "some kind of identification," and Simmons again turned his back to Deputy Roman.

At this point, Deputy Roman, sensing that something was not right, told Simmons to stop and put his hands on the wheel. Deputy Roman explained that ordinarily, when he responds to a broken-down vehicle, the occupants readily answer his questions about the problem because they want to expedite a remedy. Simmons, on the other hand, was uncooperative, evasive, and uncommunicative, which concerned Deputy Roman and led him to believe something either criminal or medical might be afoot. Deputy Roman wanted to remove Simmons from his car to determine if he was experiencing a medical condition, such as a diabetic

3

seizure, which can cause someone to not respond. However, Deputy Roman felt the situation was "completely unsafe" and backed away from the car and called for back up.

Less than five minutes later, Melbourne police officer Ashley Vanasdale arrived. Deputy Roman advised her that Simmons was not cooperative, nonresponsive, and making furtive movements and that he wanted to remove Simmons from the car. The two officers approached the vehicle, and Deputy Roman opened the car door and asked Simmons to get out. Officer Vanasdale told Simmons to make sure they could see his hands at all times. Officer Vanasdale also described Simmons as mumbling and not making sense, and she also believed he might be medically impaired.

As Deputy Roman placed his hands on Simmons and escorted him out of the vehicle, Deputy Roman felt Simmons "tense up," which Deputy Roman knew from his training and experience indicated a person might fight or flee. Deputy Roman told Simmons to calm down and asked him what was wrong and whether he was okay. Simmons did not respond and had a "dead look on his face." Deputy Roman advised Simmons that he was going to handcuff Simmons for everyone's safety. Deputy Roman then handcuffed Simmons behind his back and conducted a pat-down search of the front area of Simmons's pants where he had seen the metal clip. Deputy Roman felt something heavy and hard, which be believed was a

weapon, and removed a loaded Glock with a metal clip on it from Simmons's waistline.

Deputy Roman ran a check on the firearm and determined it was stolen. The officers found mail in Simmons's car with his name on it and confirmed his identity in a database of driver's license pictures. When Deputy Roman learned Simmons had prior felony convictions and did not have a permit to carry the firearm, Simmons was arrested. Due to Deputy Roman's concerns about Simmons's medical condition, he did not have Simmons taken directly to jail, but rather to a hospital to be medically evaluated.

## II. DISCUSSION

The Fourth Amendment provides the right to be secure against unreasonable searches and seizures. U.S. Const. amend. IV. Not every encounter between a police officer and a citizen in a public place constitutes a seizure. United States v. De La Rosa, 922 F.2d 675, 678 (11th Cir. 1991). For example, as the Supreme Court has noted, police officers frequently interact with the public when responding to traffic accidents, "in which there is no claim of criminal liability and engage in what . . . may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady v. Dombrowski, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973). Such consensual encounters do not implicate the Fourth

5

Amendment.  United States v. Jordan, 635 F.3d 1181, 1185-86 (11th Cir. 2011) (describing these encounters as "police-citizen exchanges involving no coercion or detention"); see also United States v. Perez, 443 F.3d 772, 777-78 (11th Cir. 2006) (explaining that an officer does not seize a person for Fourth Amendment purposes merely by approaching the person on the street and asking the person questions).

A consensual encounter becomes a "seizure" for Fourth Amendment purposes "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16 (1968).  Although an imprecise test, we look at factors such as "whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect; and the language and tone of voice of the police." De La Rosa, 922 F.2d at 678.

Moreover, "when an officer legitimately encounters an individual, whether he is investigating that individual or not, the officer may reasonably believe himself to be in danger and may wish to determine quickly whether that person is armed." United States v. Bonds, 829 F.2d 1072, 1074 (11th Cir. 1987); cf. Terry, 392 U.S. at 29, 88 S. Ct. at 1884 (explaining that a frisk may be justified to protect officers and others nearby if it is limited in scope to an intrusion designed to

discover weapons). This belief must be based on a reasonable suspicion that the individual is armed and dangerous. Arizona v. Johnson, 555 U.S. 323, 332, 129 S. Ct. 781, 787 (2009). The standard requires "an objectively reasonable fear based upon specific facts regarding specific individuals." Bonds, 829 F.2d at 1074. Reasonableness is defined in objective terms by examining the totality of the circumstances. Ohio v. Robinette, 519 U.S. 33, 39, 117 S. Ct. 417, 421 (1996); see also United States v. Matchett, 802 F.3d 1185, 1192 (11th Cir. 2015) (explaining that when considering whether an officer reasonably believed his safety was threatened, we evaluate the totality of the circumstances and not each fact in isolation). We afford officers great deference in their evaluation of the attendant circumstances threatening their safety on the scene. United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003).

Here, based on the evidence presented at the suppression hearing, the district court did not err in concluding that Deputy Roman's brief detention and pat-down search of Simmons for a weapon was reasonable under the circumstances. There is no dispute that Deputy Roman's encounter with Simmons began as a consensual one, with Deputy Roman attempting to assist Simmons with what appeared to be a disabled car in the middle of a lane of traffic. To properly complete his caretaking function, Deputy Roman needed to determine why Simmons's car was in the middle of the left turn lane and what needed to be done to help Simmons.

Simmons maintains that the encounter became a seizure when Deputy Roman ordered him to put his hands on the steering wheel and not move, and not when Deputy Roman asked Simmons to get out of the car and handcuffed him, as the district court found.  We need not resolve this issue because, regardless of when the consensual encounter became a seizure for Fourth Amendment purposes, Deputy Roman's brief and minimally intrusive detention of Simmons in his own car to allow Deputy Roman to ensure his own safety before resuming his interaction with Simmons was objectively reasonable.

By the time Deputy Roman told Simmons to put his hands on the steering wheel, his concerns about Simmons and his car had not been dispelled but rather heightened.  Deputy Roman had observed that Simmons was not responding to his questions like an ordinary disabled motorist.  Indeed, Simmons did not respond to most of Deputy Roman's questions, his few responses were incoherent mumbling, and he appeared to be impaired.  Simmons also made furtive movements, twice turning his back to Deputy Roman in an unusual manner that obscured Simmons's hands.  Despite fumbling around in his car, Simmons was unable to produce any form of identification, proof of insurance, or car registration.  Meanwhile, Deputy Roman observed a metal clip on Simmons's waistband that he knew from experience was the kind used to secure a knife or gun.  Deputy Roman explained that at this point in the consensual encounter, he sensed something was wrong and

8

that the situation was not safe.  Under these circumstances, Deputy Roman was justified in directing Simmons to place his hands on the steering wheel where Deputy Roman could see them and to not move, while Deputy Roman backed up to a safer distance and waited for a back-up officer to arrive.

Simmons argues that his detention was unreasonable because Deputy Roman did not have a reasonable articulable suspicion that Simmons was engaged in illegal activity.  Although Deputy Roman did suspect that Simmons was either medically impaired or engaged in illegal activity, this was not the basis for Deputy Roman's brief detention of Simmons in his own car.  Deputy Roman detained Simmons to call for back up because he was concerned for his own personal safety while he continued to investigate why Simmons's car was in the middle of the road and whether Simmons needed medical help.  Given Simmons's extremely odd and unresponsive behavior and the metal clip on his waistband, Deputy Roman reasonably suspected that Simmons was armed and posed a threat to Deputy Roman's safety.  The Fourth Amendment does not require a police officer to ignore objectively reasonable warning signs of a threat to his own safety when he interacts with a citizen, whether he is investigating that citizen for a crime or not. See Bonds, 829 F.2d at 1074.

Likewise, Deputy Roman's decision to handcuff Simmons and conduct a pat-down search to determine whether Simmons in fact had a weapon clipped to

9

his waistband, as Deputy Roman suspected, was also objectively reasonable given the circumstances. Deputy Roman wanted to remove Simmons from his car to determine if he was medically impaired. As Simmons exited his vehicle, he tensed up, which Deputy Roman knew from his training and experience was an indication Simmons might be getting ready to either fight or flee. Based on the metal clip observed at Simmons's waistband, Deputy Roman had reason to believe Simmons had easy access to a weapon if he was inclined to fight the officers. In addition, Simmons still was not responding to Deputy Roman's questions and had a "dead look on his face." Under these circumstances, it was reasonable for Deputy Roman to place Simmons in handcuffs to ensure everyone's safety while he conducted the pat-down search for the suspected weapon. See id. at 1073, 1075 (upholding an officer's protective "frisk" of a person who was not the target of the criminal investigation, but who arrived on the scene and was believed to be carrying a firearm); cf. Terry, 392 U.S. at 27, 88 S. Ct. at 1883 (holding that an officer may frisk a legally stopped individual for weapons if he has reason to believe the individual is armed and dangerous to ensure his and others' safety).[2]

---

[2]We reject Simmons's argument that our precedent in Bonds is inconsistent with the Supreme Court's Terry. Both require an officer to have reason to believe the individual he or she frisks is armed and dangerous. See Terry, 392 U.S. at 27, 88 S. Ct. at 1883; Bonds, 829 F.2d at 1074-75. Furthermore, although Terry involved an officer's stop and frisk while investigating possible criminal activity, nothing in Terry prohibits an officer performing a community caretaker function like the one Deputy Roman was performing here from taking reasonable steps to protect himself and others by frisking an individual whom he has reason to believe is armed and dangerous. See Terry, 392 U.S. at 13, 88 S. Ct. at 1876 (recognizing that "[e]ncounters are

### III. CONCLUSION

In sum, Deputy Roman legitimately encountered Simmons while performing his community caretaker function of assisting a disabled motorist. Deputy Roman's observation of a metal clip on Simmons's waist that he knew was often used to carry a weapon and Simmons's uncooperative and furtive behavior justified detaining Simmons in his car with his hands on the steering wheel until back up arrived before continuing to investigate what he then reasonably believed was a medically impaired motorist. Finally, all of the circumstances recounted above, coupled with Simmons's tensing up upon exiting the vehicle, gave Deputy Roman reason to believe that he and Officer Vanasdale might be in danger. As such, Deputy Roman's brief seizure and protective pat-down search of Simmons for a weapon was reasonable under the Fourth Amendment.

For these reasons, the district court did not err in denying Simmons's motion to suppress and Simmons's conviction is affirmed.[3]

**AFFIRMED.**

---

initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime.").

[3]Simmons does not appeal his 78-month sentence.

11