**UNITED STATES of America**

v.

**Juan Garcia MARTEL and
José Luis Solis.**

**Criminal No. 96–0683.**

United States District Court,
D. New Jersey.

June 12, 1997.

**318**

Faith S. Hochberg, U.S. Attorney, Henry E. Klingeman, Assistant U.S. Attorney, U.S. Department of Justice, District of New Jersey, Newark, NJ, for the United States of America.

Richard J. Coughlin, Federal Public Defender for the District of New Jersey, Camden, NJ, for Defendant José Luis Solis.

Michael A. Robbins, Newark, NJ, for Defendant Juan Garcia Martel.

## OPINION

ORLOFSKY, District Judge.

On November 7, 1996, defendants, Juan Garcia Martel ("Garcia") and José Luis Solis ("Solis"), along with nine other individuals,

were arrested at a gas station in Jersey City, New Jersey. Agents of the Immigration and Naturalization Service ("INS") determined that Garcia, and the nine passengers in the van Garcia and Solis had driven to New Jersey from Houston, Texas, were undocumented aliens.

On November 14, 1996, Solis and Garcia were each indicted on one count of conspiracy to transport illegal aliens within the United States in violation of 18 U.S.C. § 371, and one count of transporting illegal aliens within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).

Defendants have filed motions seeking to suppress the evidence of the presence of illegal aliens in the van, and to suppress statements given to INS agents on the date of their arrest, all of which they contend are the "fruit" of an illegal seizure of their persons in violation of the Fourth Amendment. Alternatively, defendants move to suppress the statements given to the INS agents as coerced in violation of their rights under the Fifth Amendment.

Defendants' motion to suppress requires this court to undertake an analysis of the Supreme Court's burgeoning Fourth Amendment jurisprudence in the unique factual context of this case. For the reasons set forth below, I conclude that the evidence obtained by the New Jersey State Police and the INS were the "Fruits" of an illegal seizure in violation of the Fourth Amendment and must be suppressed.

## I. Facts [1]

On the morning of November 7, 1996, New Jersey State Police Detective James Price and his partner, Detective Michael Fallon, who were assigned to the Narcotics Trafficking Unit of the Narcotics and Organized Crime Bureau, were conducting a mobile surveillance operation from an unmarked automobile in Jersey City, New Jersey. Transcript of April 18, 1997 hearing (hereinafter "Tr.") at 10–12. The target of this surveillance was a vehicle known to have been

1. On April 18, 1997, this Court conducted an evidentiary hearing at which testimony was taken from New Jersey State Police Detective James

Price, Agents John Parkin and Edwin Claros of the Immigration and Naturalization Service, and defendant, José Solis.

involved in alleged drug trafficking. The detectives suspected that the vehicle and its driver might be at a motel adjacent to the New Jersey entrance to the Holland Tunnel. Tr. at 11.

At approximately 10:40 in the morning, while detectives Price and Fallon drove around the area near the entrance to the Holland Tunnel in search of the target vehicle, Price observed a van with tinted windows, parked near two public telephones in the parking lot of a Texaco gas station on the main access road to the Holland Tunnel. Tr. at 12–13. The detectives pulled their car into a parking lot adjacent to the Texaco station from which they could observe the van and its occupants. Tr. at 13–14. From this position, Detectives Price and Fallon recorded the van's license plate number and radioed it to police headquarters. Tr. at 14. A vehicle registration check revealed that the van, a 1996 Ford Club Wagon, was registered to Anna and Adrian Garcia of Pasadena, Texas. Id. An NCIC check uncovered no information implicating the van in any illegal activity. Tr. at 36. As Detectives Price and Fallon observed the scene from behind a fence in the adjacent parking lot, they noticed heavy "foot activity between the van and the phones and people going into the snack shop there at the Texaco station, getting sodas or whatever they were, condiments, whatever...." Tr. at 32. The detectives also observed that the van's occupants were largely, or exclusively, Hispanic males. Tr. at 33.

Detective Price testified that, at the point that he and Detective Fallon decided to approach the defendants, the detectives "had no evidence of any type of criminal activity," rather, the approach was purely "an investigative approach just to find out, see what was going on ... [t]he nature of the business." Tr. at 44. Detective Price also testified that, more than the fact that the van was from Texas, a "source state" for illegal drugs, he was "intrigued ... even more" by the fact that certain individuals from the van were standing by the pay telephones apparently awaiting incoming calls. Tr. at 52. Detective Price described a "very common element that we see during the course of some of these narcotics investigations," which he termed "pager phone activity," in which a drug trafficker uses a pay telephone to contact another pager and awaits a return telephone call. Id. Detective Price admitted that he did not see any of the individuals involved wearing or using a pager. Id.

Upon entering the parking lot of the Texaco station, Detective Price first approached Solis, because, judging from his "observations from the other side of the fence [Solis] looked as though, (a) he was the driver, (b) he looked like he was choreographing what was going on here. He appeared to be the authority figure, so to speak." Tr. at 40. Detectives Price and Fallon, who wore plain clothes and carried their weapons concealed in a "fanny pack," identified themselves as New Jersey State Police officers and asked Solis for identification. Tr. at 17. Solis complied, handing Price his valid Texas operator's license. Tr. at 18. Either Detective Price or Detective Fallon held onto the license. Tr. at 77. Detective Price also testified that he "may have pat searched Mr. Solis and maybe Mr. [Garcia], I don't recall. I usually do as a practice." Tr. at 25. In any event, the pat searches revealed nothing incriminating. Id.

Shortly after Solis produced his operator's license, Price observed two individuals walking toward a parked Volkswagen, and gestured with his hand for them to stop, which they did. Tr. at 43, 48. The driver of the Volkswagen, Alphonso Quito, told Detective Price that he had agreed to drive the other individual to Lodi, New Jersey. Tr. at 50. Mr. Quito's would-be passenger spoke no English. Tr. at 49. Detectives Price and Fallon called for a Spanish-speaking officer, and in response to that request New Jersey State Police Detective Carlos Tapia soon arrived at the scene and began interviewing the occupants of the Volkswagen and the van in Spanish. Tr. at 20, 50. After interviewing the van occupants, Detective Tapia advised Solis of his Miranda rights. Tr. at 20. Subsequently, Detective Price prepared a New Jersey State Police "consent to search" form, which he explained to Solis, and which Solis signed. Tr. at 22. The search of the van conducted pursuant to the signed consent

revealed "[n]othing of evidential nature," according to Detective Price. Tr. at 23.

The State Police detectives subsequently contacted the Immigration and Naturalization Service ("INS") to ask them to evaluate the situation, if they considered it was "worthy to respond to the location." Tr. at 23. INS agents responded to the scene within a few minutes and detained Solis and his co-defendant, Garcia, along with the occupants of the van, all of whom were undocumented aliens. Tr. at 157.

## II. Discussion

■ Defendants assert that they were "seized" within the meaning of the Fourth Amendment, without probable cause, before the police searched their van, and therefore, the evidence and statements flowing from that allegedly illegal seizure must be suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (announcing the "fruit of the poisonous tree" doctrine).

■ Whether an individual has been "seized," or whether there has been nothing more than a consensual encounter, depends upon whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The totality of the circumstances must be assessed objectively. *Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 2388-89, 115 L.Ed.2d 389 (1991). In evaluating the totality of the circumstances, however, it is appropriate to consider a defendant's characteristics, such as age, maturity, education, intelligence, and experience. *See United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 827-28, 46 L.Ed.2d 598 (1976); *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The purpose of the Fourth Amendment is not "to eliminate all contact between the police and the citizenry." *Mendenhall,* 446 U.S. at 553, 100 S.Ct. at 1877. Rather, the amendment simply requires police officers to refrain from coercive conduct which is unreasonable under the circumstances, in this instance, conduct which would lead a reasonable person to believe that he or she could not freely terminate the encounter.

The test which the Supreme Court announced in *Mendenhall* "is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). Nevertheless, there are a number of indicia of a Fourth Amendment "seizure," some of which were recited by the Supreme Court in *Mendenhall,* including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall,* 446 U.S. at 555, 100 S.Ct. at 1877.

In this case, the Government points out that: (1) Detectives Price and Fallon did not park in such a way as to block defendants' egress from the service station; (2) Detectives Price and Fallon displayed no weapons during the encounter; (3) Detective Price's unrebutted testimony was that the interviews with defendants were conducted in a polite and informal tone, which the defendant Solis reciprocated; (4) Solis completed a written consent to search the van, after having been advised of his right to refuse his consent; and, (5) Detective Price did not recall even speaking to defendant, Garcia.

On the other hand, an assessment of the characteristics of the defendants reveals that neither defendant is learned, either through experience or training, in the law of search and seizure. Neither Solis, nor Garcia, has a criminal record. While Solis, who is thirty years old, is a high school graduate and a lifelong United States citizen, Garcia, who was nineteen at the time of this encounter, speaks no English, and has completed only the sixth grade in a Mexican grammar school. Considering these factors, it is reasonable to infer that the defendants' compliance with the detectives' requests may have been less than completely consensual.

■ The Government first contends that the detectives never ordered anyone to stop. Government's Supplemental Brief at 7. While there can be little doubt that compliance with a police officer's order to stop will amount to a "seizure" implicating the Fourth Amendment, *see California v. Hodari D.*, 499 U.S. 621, 626–27, 111 S.Ct. 1547, 1550–51, 113 L.Ed.2d 690 (1991), the absence of a command does not imply the absence of a "seizure."[2]

Next, the Government contends that "Detective Price's request that Solis produce a driver's license for examination does not transform the encounter into a stop." Government's Supplemental Brief at 7 (citing *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984)). However, Detective Price did not confine his conduct to a simple request to see Solis' operator's license. Either Detective Price or Detective Fallon retained possession of the operator's license, apparently throughout the encounter. Tr. at 77. This fact lends considerable weight to the view that, at this point in the encounter, a reasonable person would not have felt free to leave. *See Florida v. Royer*, 460 U.S. 491, 496, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (opinion of White, J.) (detective's retention of airline ticket indicative of seizure) *See also United States v. Jordan*, 958 F.2d 1085, 1087–89 (D.C.Cir.1992) ("[W]hat began as a consensual encounter ... graduated into a seizure when the officer asked [for defendant's] consent to search ... after he had taken and still retained [defendant's] driver's license."); *United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir.1988) (consensual encounter may become a seizure if the police officer retains the individual's driver's license); *United States v. Cordell*, 723 F.2d 1283, 1285 (7th Cir.1983) (Fourth Amendment "detention," necessitating a reasonable, articulable suspicion of criminal activity, occurred when police officer handed defendant's license and ticket to another officer); *United States v. Thompson*, 712 F.2d 1356, 1359 (11th Cir. 1983) (questioning of an individual "matured into an investigative stop" when police retained his driver's license after examining it); *United States v. Waksal*, 709 F.2d 653, 660 (11th Cir.1983) (police officers' failure to return defendant's ticket and license "persuasively indicates an encounter that had progressed beyond truly voluntary police-citizen contact"). *Cf. United States v. Thame*, 846 F.2d 200, 203 (3d Cir.1988) (Police officers' conversation with defendant did not ripen into a detention when officers made no attempt to restrain or "otherwise control [the defendant's] movement by retaining his papers."). It is simply not reasonable to believe that Solis, more a thousand miles from his home, would have felt free to end an encounter with the police when that decision would have entailed abandoning his operator's license. *See Royer*, 460 U.S. at 503 n. 3, 103 S.Ct. at 1335 n. 3 (opinion of White, J.) (Officers' retention of the defendant's identification and ticket is critical to the analysis because "as a practical matter, [the defendant] could not leave the airport without them."). *Cf. United States v. Place*, 462 U.S. 696, 708, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983) ("The person whose luggage is detained is technically still free to continue his travels.... Nevertheless, such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans....").

■ Finally, the Government contends that the evidence does not support a finding that either detective subjected the defendants to a pat-down search. Government's Supplemental Brief at 7. In effect, the Government concedes that whether a police officer actually touches the person of a defendant in the course of an encounter is critical in evaluating whether a seizure has taken place. At the April 18, 1997, hearing, Assistant United States Attorney Henry Klingeman put the following question to Detective Price:

Q. Did you or any other officer touch, physically touch any of the persons from the van?

---

2. *Hodari D.* added a new gloss to the *Mendenhall* test, holding that no seizure occurred when the suspect never submitted to police authority but instead attempted to flee. That nuance is unimportant in this case as the evidence clearly demonstrates that defendants Solis and Garcia at all times cooperated with the police and the INS agents.

A. I may have pat searched Mr. Solis and maybe Mr. Martel, I don't recall. I usually do as practice.

Tr. at 25. Having had an opportunity to observe Detective Price's demeanor at the evidentiary hearing, and upon consideration of the circumstances surrounding his encounter with Solis and Garcia, as well as his extensive training and experience as a police officer,[3] I find that Detective Price did, in fact, pat search both Solis and Garcia. Even if the retention of Solis' operator's license, without more, is insufficient to establish a "seizure" within the meaning of the Fourth Amendment, the pat searches of the defendants transform an otherwise consensual exchange between two individuals and two police detectives into an investigative stop. In *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968), the Supreme Court held that the limited intrusion represented by a brief stop and a pat search for weapons may be conducted on less than probable cause, as long as "the police officer [is] able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Although a *Terry* "patdown" for weapons is a Fourth Amendment "search," rather than a "seizure," it is implicit in the rationale of *Terry* that a "seizure" of the person, however limited, is a necessary predicate to the pat search for weapons. *Id.* at 16, 88 S.Ct. at 1877.

◼ Therefore, *Terry* pat searches, unless consensual, will always implicate Fourth Amendment "seizure" doctrine. *See Kolender v. Lawson,* 461 U.S. 352, 364, 103 S.Ct. 1855, 1861–62, 75 L.Ed.2d 903 (1983) (*Terry* doctrine permits police officers to use a number of devices with "substantial coercive impact," including a pat search for weapons). As the Supreme Court has observed, the effect of a *Terry* pat search is such that "few people will ever feel free not to cooperate fully with the police by answering their questions." *Id.* (citing 3 W. LaFave, *Search and Seizure* § 9.2, at 53–55 (1978)). Indeed, the Supreme Court declared it unsurprising that suspects cooperate during *Terry* encounters, "even when the suspects have a great deal to lose by cooperating." *Id.* (citations omitted). *See also Hodari D.,* 499 U.S. at 635–36, 111 S.Ct. at 1555–56 ("*Terry* broadened the range of encounters between the police and the citizen encompassed within the term 'seizure,' while at the same time, lowering the standard of proof necessary to justify a 'stop' in the newly expanded category of seizures now covered by the Fourth Amendment.").

The Government contends that there is no evidence that the pat searches, if they occurred, were not consented to. Government's Supplemental Brief at 7. However, Detective Price testified, after refreshing his recollection, that "I have no reflection in any report of any conversation with Mr. Martel. And as I recall, he may have—I'm not sure if he was able to speak English." Tr. at 24. Detective Price testified to his recollection that Garcia could not speak English[4] only minutes before he testified that he "may have pat searched" Garcia. Tr. at 25. The issue of consent, therefore, is a red herring.

◼ In addition to the *Terry* pat search and the retention by the detectives of Solis' license, there are other, albeit less powerful indicia in this case of a "show of authority" to which an objectively reasonable person would submit. Detective Price testified that one of the first things he saw on entering the Texaco station was a third person, not Solis or Garcia, walking toward a Volkswagen. Tr. at 40–41. After approaching Mr. Solis, who appeared to be in charge, Detective Price indicated with his hand for the third person to stop. Tr. at 43. That person, who was either the driver or the would-be passenger of the Volkswagen did stop. *Id.* At some time between the initial approach to Mr. Solis and the time Mr. Solis gave his written consent to search the van, Detective Price approached the Volkswagen and attempted to engage its occupants in conversation. Tr. at 47. It is unclear from the record whether Solis and Garcia were immediately aware of

---

3. Detective Price, a fourteen year veteran of the New Jersey State Police, testified that he had received extensive training in narcotics investigations. Tr. at 9–10.

4. When Detective Price was asked if he spoke Spanish, he replied, "Not at all." Tr. at 46.

the detectives' decision to call a third police officer to the scene. In any event, a third detective, Carlos Tapia, soon arrived. I do not hold that the presence of three police officers at the scene automatically constitutes "the threatening presence of several officers" discussed in *Mendenhall*. *Mendenhall*, 446 U.S. at 555, 100 S.Ct. at 1877. However, the possibility that a suspect is aware that an additional officer has been called to the scene naturally bears on that individual's objective assessment of whether he or she is free to end the encounter.

 Furthermore, from the context of Detective Price's testimony at the April 18, 1997, evidentiary hearing, it is clear that the retention of Solis' operator's license and the pat searches of Solis and Garcia occurred only shortly before Solis gave his written consent to search the van. Thus, the record reflects that the conduct on Solis' part which the Government relies upon to establish consent appears to have occurred contemporaneously with the seizure. When, as here, a suspect manifests his consent contemporaneously with an illegal seizure, the conduct of the person seized is not free from the taint of his unlawful detention and, thus, is insufficient to show consent. *See Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *Royer*, 460 U.S. at 507–08, 103 S.Ct. at 1329–30; *United States v. Jerez*, 108 F.3d 684, 695 (7th Cir.1997); *United States v. Chavez–Villarreal*, 3 F.3d 124, 128 (5th Cir.1993). Accordingly, I conclude that the evidence of the presence of illegal aliens in the van was procured through an illegal seizure of Solis and Martel, which seizure occurred before, and resulted in, Solis' consent to the search.

Having concluded that the Detective Price "seized" Solis and Garcia in violation of the strictures of the Fourth Amendment, it follows that the evidence obtained as a result of that seizure must be suppressed. This is so because the Government does not contend that Detectives Price and Fallon had probable cause to arrest Solis and Garcia, or that they had even the reasonable suspicion necessary to justify a *Terry* stop. The testimony adduced at the April 18, 1997, hearing bears out the absence of reasonable suspicion

in this case. Indeed, Detective Price testified that, at the time he and Detective Fallon approached the defendants, "we really had no evidence of any type of criminal activity at that point." Tr. at 44.

 Detective Price's own characterization of the nature of his suspicion is further borne out by the evidence. Detective Price testified that, prior to deciding to investigate further, he and Detective Fallon merely saw several Hispanic males apparently waiting at and around public telephones near a van at a service station. Tr. at 31, 33, 44. Ethnicity or racial appearance alone cannot support a reasonable suspicion. *United States v. Brignoni–Ponce*, 422 U.S. 873, 885–86, 95 S.Ct. 2574, 2582–83, 45 L.Ed.2d 607 (1975). *See also United States v. Anderson*, 923 F.2d 450 (6th Cir.1991) (suspicions based solely on the race of the person stopped cannot give rise to a reasonable suspicion justifying a *Terry* stop). The only additional factor known to Detective Price before he decided to investigate was that the van bore Texas license plates, and Texas is a known narcotics "source" state. Tr. at 62, 76. Yet the detectives ran an NCIC check on the registration of the vehicle, prior to deciding to investigate further, which revealed no evidence of illegal activity. Tr. at 36. In sum, Detectives Price and Fallon had, at best, a mere hunch that a further investigation of a van with Texas license plates, its drivers and passengers would reveal evidence of criminal activity, a hunch which turned out to be correct. Unfortunately, only an "articulable suspicion," at a minimum, and not a hunch, can justify a *Terry* stop.

Solis and Garcia have also moved to suppress the incriminating statements they gave to INS agents in which they allegedly detailed their activities in transporting these and other illegal aliens. The admissibility of these statements, however, is determined by this court's decision to suppress the evidence obtained from the illegal seizure, unless subsequent events sufficiently " 'attenuate[d] the taint of [the] unconstitutional arrest' " to allow the introduction of these statements at trial. *See Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416

(1975). The Government bears the burden of proving a break in the causal chain, *id.* at 604, 95 S.Ct. at 2262, a burden it has not even attempted to shoulder in this case. Accordingly, these statements must also be suppressed.[5]

### III. Conclusion

For all of the foregoing reasons, the evidence of the presence of illegal aliens in the van driven by the defendants and the defendants' statements given to the IRS in connection with this incident must be suppressed. The court will enter an appropriate order.[6]

### ORDER

This matter having come before the Court on the motions of defendants, Juan Garcia Martel and José Luis Solis, to suppress certain evidence and certain statements, to compel disclosure of *Brady* materials, to preclude the introduction of 404(b) evidence, and to compel disclosure of expert testimony, and on the cross-motion of the Government for reciprocal discovery, Henry E. Klingeman, Esq., Assistant United States Attorney, appearing on behalf the United States of America, and Michael A. Robbins, Esq., appearing on behalf of Defendant, Juan Garcia Martel, and Richard J. Coughlin, Esq., Federal Public Defender for the District of New Jersey, appearing on behalf of Defendant, José Luis Solis; and,

The Court having considered the briefs in support of and in opposition to these motions, the supplemental briefs, the testimony at the evidentiary hearing conducted on April 18, 1997, the exhibits introduced at that hearing, and the other exhibits on file, for the reasons set forth in this Court's OPINION, filed concurrently with this ORDER,

It is on this 12th day June, 1997, ORDERED that:

1. The motion of Defendant, José Luis Solis, to suppress certain evidence and statements is GRANTED to the extent set forth in the OPINION accompanying this Order;

2. The motion of Defendant, Juan Garcia Martel, to suppress certain evidence and statements is GRANTED to the extent set forth in the OPINION accompanying this Order;

3. Defendants' motion to compel production of *Brady* material in the possession, custody or control of the government is GRANTED;

4. Defendants' motion to exclude 404(b) evidence is DENIED without prejudice to defendants' right to renew their motion at trial;

5. Defendants' motion to compel disclosure of expert testimony is DISMISSED AS MOOT, inasmuch as the United States does not intend to offer expert testimony;

6. The cross-motion of the United States for reciprocal discovery will be GRANTED.

---

5. In view of this court's disposition of the motions to suppress based upon the nature of the stop, it is unnecessary to address defendants' "supervisory powers" claim that the INS unreasonably delayed the presentation of the defendants to a magistrate judge in violation of Fed. R.Crim.P. 5.

6. This court's rulings from the bench on April 18, 1997, deciding the remaining issues presented by these motions, and the Government's cross-motion, will be memorialized in that order.